UNITED STATES v. SHERIDAN-KIRK CONTRACT CO.

(District Court, S. D. Ohio, W. D.   December 4, 1906.)

No. 620.

1. CRIMINAL LAW—JURISDICTION—MASTER AND SERVANT—HOURS OF SERVICE.

In a prosecution of government contractors for "unlawfully, intentionally, and knowingly requiring or permitting a laborer or mechanic, employed on public work," to wit, a dam across the Ohio river, to work more than eight hours in a single calendar day, contrary to the provisions of Act Cong. Aug. 1, 1892, c. 352, 27 Stat. 340 [U. S. Comp. St. 1901, p. 2521], "relating to the limitation of the hours of daily service of laborers and mechanics employed upon the public works of the United States and of the District of Columbia," the offense is not the working overtime by the laborer or mechanic, but is on the part of the contractor in requiring and permitting such overtime work to be done; and hence, where the work is directed, required, or permitted from the Ohio side of the river, the federal court for the Southern District of Ohio has jurisdiction over the offense, notwithstanding some or all of the work may have been performed south of the line which divides the states of Ohio and Kentucky.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, §§ 177, 220.]

2. INDICTMENT—COMMISSION OF OFFENSE—TIME—EVIDENCE.

The time of the commission of such an offense as laid in the indictment does not confine the proof within the limits of that period, but proof that the offense was committed on or about the dates fixed in the indictment, if confined to dates prior to the finding of the grand jury, is competent to establish the charge.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indictment and Information, § 548.]

3. MASTER AND SERVANT—HOURS OF LABOR—BURDEN OF PROOF.

The rule which places the burden of proof upon the party who, under the circumstances of the case, is best able to make the proof, requires, in a prosecution for violation of the eight-hour law, that the burden of show-

ing the alleged offense was justified by an extraordinary emergency shall be upon the one interposing such a defense, who from the necessities of the case is possessed of special knowledge with reference thereto.

**4. SAME—EXTRAORDINARY EMERGENCY—EVIDENCE.**

An "extraordinary emergency" in connection with the building of a dam across the Ohio river cannot be construed as a continuing emergency, which would suspend the eight-hour law during the entire life of the contract, nor an emergency growing out of the scarcity of labor, nor can it be made to include, not only the time of the happening of a flood, but also the time required to repair the injuries resulting therefrom; but it is such an unforeseen, sudden, or unexpected emergency as requires immediate action or remedy, and when the emergency passes the privilege ceases.

**5. SAME—DEFENSES.**

Where a defendant has been notified by government engineers that he can no longer rely on the construction of the eight-hour law given by that department during the years immediately following the passage of the law, he is not entitled to introduce such construction as a defense.

Submitted on Motion for New Trial.

Sherman T. McPherson, U. S. Atty., Edward P. Moulinier and Thomas H. Darby, Asst. U. S. Attys. ·

Lawrence Maxwell, Jr., Sayler & Sayler and Charles T. Greve, for defendants.

THOMPSON, District Judge. The indictment was found under the act of Congress of August 1, 1892 (27 Stat. 340, c. 352 [U. S. Comp. St. 1901, p. 2521]), entitled "An act relating to the limitation of the hours of daily service of laborers and mechanics employed upon the public works of the United States and of the District of Columbia," which provides as follows:

"That the service and employment of all laborers and mechanics who are now or may hereafter be employed by the government of the United States, by the District of Columbia, or by any contractor or subcontractor upon any of the public works of the United States or of the said District of Columbia, is hereby limited and restricted to eight hours in any one calendar day, and it shall be unlawful for any officer of the United States govermnent or of the District of Columbia or any such contractor or subcontractor whose duty it shall be to employ, direct or control the services of such laborers or mechanics to require or permit any such laborer or mechanic to work more than eight hours in any calendar day except in case of extraordinary emergency.

"Sec. 2. That any officer or agent of the Government of the United States or of the District of Columbia, or any contractor or subcontractor whose duty it shall be to employ, direct or control any laborer or mechanic employed upon any of the public works of the United States or of the District of Columbia who shall intentionally violate any provision of this act, shall be deemed guilty of a misdemeanor, and for each and every such offense shall upon conviction be punished by a fine not to exceed one thousand dollars or by imprisonment for not more than six months, or by both such fine and imprisonment, in the discretion of the court having jurisdiction thereof."

The indictment contains four counts. The first count reads as follows:

"In the District Court of the United States within and for the Western Division of the Southern District of Ohio, in the Sixth Judicial Circuit,· of the term of October, in the year of our Lord one thousand nine hundred and six. The grand jurors of the United States of America, duly impancled, sworn, and charged to inquire within and for the Western division of said district, upon their oaths and affirmations, present that the Sheridan-Kirk Contract

Company is a corporation organized under the laws of West Virginia, and that said company has an office in the city of Cincinnati, Ohio; and that said Sheridan-Kirk Contract Company entered into a written contract with the government of the United States of America on or about October 27th, 1904, for the construction of a dam across the Ohio river, known and particularly described as Dam No. 37; said dam across the Ohio river being situated near Fernbank, Hamilton county, Ohio. That the construction of said dam No. 37 across the Ohio river was a public work of the United States government, duly authorized by the laws of the United States. That Thomas A. Sheridan is one of the principal owners of stock of said Sheridan-Kirk Contract Company, and is one of the managers of said company in the construction of said dam No. 37; and that W. J. Ellison is superintendent of said Sheridan-Kirk Contract Company. That the work on the construction of said dam is directed and carried on from the Ohio side of said river near Fernbank, Ohio. That said Thomas A. Sheridan and W. J. Ellison are in active charge of said dam No. 37 for the said Sheridan-Kirk Contract Company, and as agents and officers of said company have full power to employ, direct, and control laborers and mechanics employed upon said public work, to wit, dam No. 37. That the said Sheridan-Kirk Contract Company, through its duly authorized agents and officers, on, to wit, the eighth day of September, in the year of our Lord one thousand nine hundred and six, in the county of Hamilton, in the state of Ohio, in the circuit and Western division of the district aforesaid, and within the jurisdiction of this court, did then and there unlawfully, intentionally, and knowingly direct and permit one Loy Yagel, a laborer employed by said Sheridan-Kirk Contract Company in the construction of said public work, to work upon said public work more than eight hours in said calendar day. That said Loy Yagel, laborer as aforesaid, upon said day was required and permitted by the said Sheridan-Kirk Contract Company, through its duly authorized officers and superintendent of said public work, to work ten hours upon said calendar day. And the grand jurors aforesaid do further find that there was no extraordinary emergency of any character or kind to require said laborer, Loy Yagel, to work more than eight hours in said calendar day; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America."

The other three counts name different laborers, who, at different times, were required, directed, or permitted to labor upon said public work, but are in all other respects identical with the first count.

The court instructed the jury to return a verdict of "not guilty" upon the fourth count, and submitted the other three counts to the jury, upon which they returned a verdict of "Guilty." The court has not considered all the assignments of the motion for a new trial, but only those presented at the hearing of the motion.

It was urged by counsel for the defendant:

(1) That the court erred in its instruction to the jury upon the question whether the offense charged was committed within the territorial jurisdiction of the court, and in refusing to give to the jury a special instruction upon this question requested by the defendant. The instruction given was as follows:

"It is offered as a matter of defense that there is testimony in the case which shows or tends to show that the offense was not committed within the jurisdiction of this court; that it was committed in the state of Kentucky, and not in the state of Ohio. Now, that is a question which you must decide from the evidence which has been submitted to you. The state line of Ohio extends to the low-water mark on this side of the Ohio river, and not beyond that. If the offense here charged was committed in Kentucky, then this court would have no jurisdiction. The government claims that the work was conducted from the Ohio side, near Fernbank, a village near this city, in Hamilton county, and that this man, Loy Yagel, was permitted by the defendant to

work more than eight hours in one calendar day, and that it was done in the state of Ohio, on this side of the low-water mark in the Ohio river. If the evidence does not satisfy you that the act was committed within the state of Ohio, if there is a reasonable doubt of that, the defendant should have the benefit of that doubt. It is for you to determine, from the evidence whether the offense charged was committed within the boundaries of Ohio, and not in Kentucky."

The special instruction which was refused reads as follows:

"To constitute an offense within this district, the work of the laborer or mechanic must have been done within this district; that is, north of the low-water mark of the river. Unless you are satisfied of this fact beyond a reasonable doubt, you will find for the defendant."

The defendant insists that, in order to warrant a conviction, it was not sufficient to show that the laborers and mechanics named in the indictment were required or permitted to work on dam No. 37 more than eight hours in a calendar day, but that it was necessary to show that at the instance of the defendant they worked more than eight hours in a calendar day on that part of the dam which is within the Southern district of Ohio, and that the court should have so instructed the jury. If this be the true construction of the statute, then the contractor may, at will, defeat its operation by limiting the hours of labor to less than eight hours on each side of the boundary line between the states of Ohio and Kentucky, and may with impunity require or permit laborers and mechanics to work seven hours in Ohio and seven hours in Kentucky in any one calendar day. But what is the offense charged in the indictment? It is that the defendant on given days within the territorial jurisdiction of this court did unlawfully and intentionally require and permit certain named laborers and mechanics in the employ of the defendant to work upon a public work of the United States more than eight hours in a calendar day, and is the offense defined by the statute of August 1, 1892. It is not the doing of the work which constitutes the offense. It is not an offense for the laborer or mechanic to work more than eight hours in a calendar day upon a public work of the United States, but it is an offense for the contractor to require or permit it to be done. In this case the work was done on a public work of the United States, and it is immaterial whether it was done in Ohio or Kentucky, but, to justify a conviction, it was necessary for the government to show that the act of the defendant in requiring or permitting it to be done was committed within the territorial jurisdiction of this court, and the jury was so instructed.

(2) That the court erred in its instruction to the jury that it was not necessary, in order to warrant a conviction, to find that the offenses charged were committed on the days named in the indictment, but only that they were committed on or about said days. The time of the commission of an offense laid in the indictment is ordinarily not material, and does not confine the proofs within the limits of that period. The indictment will be satisfied by proof of the offense on any day anterior to the finding. Wharton's Crim. Ev. § 103. The objection made here is covered by the ruling of the court in State v. Munson, 40 Conn. 475. In that case the court say:

"It is doubtless true that the information and proof must be sufficiently certain to protect the defendant from another prosecution for the same offense, and enable him to plead in bar a former acquittal or conviction to a second complaint alleging the commission of the same crime. This information names a particular day, to wit, the 9th of December, and the evidence tends to prove the sale to have been made on some day in that month. There is possibly some plausibility in the claim that this is too indefinite to furnish adequate protection to the defendant, but we think it is not liable to that objection to such an extent as to subject the defendant to serious danger of a second prosecution and conviction. The proof on the trial of the present information substantially covered the entire month, and therefore he could well plead his former conviction in bar of a second complaint or information alleging another and similar offense on any other day in the same month. The result is that by a conviction under a single information containing but one count the defendant practically obtains immunity for a month, and has cause for satisfaction rather than complaint in the vagueness of the testimony as to time."

(3) That the court erred in its instruction to the jury that the burden of proof was upon the defendant to show that the employment of the laborers and mechanics for more than eight hours in a calendar day was justified by an extraordinary emergency. The statute, apparently in furtherance of a general policy sought to be established, limits and restricts the services of laborers and mechanics upon public works of the United States to eight hours in any one calendar day, and declares that it shall be unlawful for any contractor to require or permit such laborers and mechanics to work more than that time, except in case of extraordinary emergency. The restriction is general and absolutely prohibitory, save in the single instance of an extraordinary emergency which threatens injury or destruction of property, or other loss and injury. The fact of such an emergency would be especially within the knowledge of, and should be shown by, the contractor as a matter of defense. To require the government to show that no emergency had arisen to excuse noncompliance with the statute would practically defeat its enforcement. It would compel the government to anticipate and be prepared to prove the nonexistence of all probable or possible emergencies which might be suggested to the jury by the defendant. During the trial it was urged that a scarcity of labor, due to the prosperity of the country, presented an extraordinary emergency, which, as long as it continued, if for years, would suspend the operation of the statute for the benefit of the contractor, and according to the contention of the defendant would require the government to anticipate the defense and be prepared to prove the nonexistence of the emergency. The administration of justice would not be promoted, but hindered, by such course of procedure. An examination of the decisions of the courts bearing upon the point, as a rule, will show that the burden is placed upon the party who, under the circumstances of the case, is best able to make the proof. Nelson v. United States (C. C.) 30 Fed. 116, 117; Moody v. State of Ohio, 17 Ohio St. 110; United States v. Cook, 17 Wall. 173, 21 L. Ed. 538.

(4) That the court erred in its instruction to the jury explaining the meaning of the phrase "extraordinary emergency," as used in the statute. The claim of the defendant is, and was urged during the trial, that the phrase "extraordinary emergency" should be construed (1) to cover not only the time of its happening, but also the time spent in

repairing the injuries to the work caused by it and in restoring the work to its former condition, and (2) to cover the entire time employed in constructing the dam in question, as expressed in special charges 5 and 6 requested by the defendant and refused by the court, which read as follows:

"(5) The extraordinary emergency referred to in the statute is not necessarily one that must arise without warning during the progress of the work. You are entitled to consider whether the extraordinary emergency is not one inherent in this case to the entire work covered by the contract, from the beginning of the work to its completion.

"(6) It is proper for you to consider whether or not the entire work under this contract is emergency work of an extraordinary character within the meaning of this statute."

Upon these points the court instructed the jury as follows:

"An extraordinary emergency, in the view which the court takes of the statute, is something unforeseen, sudden, unexpected, which would call for immediate action or remedy; and when confronted with a situation of that kind, with the view in this instance, if you please, of protecting the work from being destroyed by flood, the defendant might require or permit the men to work more than eight hours—to work as many hours as might be necessary to meet the emergency and to prevent the injury that might follow. * * * The contractor may require or permit laborers and mechanics to work more than eight hours in a calendar day to protect the work from injury and destruction, threatened by an extraordinary emergency; but may not do so merely to repair losses caused thereby. When the emergency passes, the privilege ceases."

And:

"It is suggested in the argument of counsel that such work as this, building a dam across the Ohio river, is in its nature emergency work, and that all work done would fall within the provision of this statute which recognizes the right to employ labor for as many hours as men are willing to work; but the court does not approve that view. I present to you the other view as the one by which you must be bound—that the defendant has a right to employ labor more than eight hours a day to meet an emergency and to protect property and the work that is being done, but that, when the emergency has passed, it is not the court's understanding of the law that the men may be permitted or required afterwards to work 10 or 12 hours or more each day, in order to restore the original conditions. The language 'extraordinary emergency' cannot contemplate conditions of danger which necessarily exist and inhere in the work to be done and which will always be present from the beginning to the end of the work. If the statute contemplated anything of that kind, I think different language would have been used to express it."

The words "extraordinary" and "emergency" are defined in the Century Dictionary as follows:

"Extraordinary: 1. Being beyond or out of the common order or rule; not of the usual, customary, or regular kind; not ordinary. 4. Exceeding the common degree or measure; hence, remarkable; uncommon; rare; wonderful.

"Emergency: 2. A sudden or unexpected happening; an unforeseen occurrence or condition; specifically, a perplexing contingency or complication of circumstances. 3. A sudden or unexpected occasion for action; exigency; pressing necessity."

The contract does not recognize the work of constructing dam No. 37 as a continuing extraordinary emergency, a work undertaken to meet a sudden and unexpected happening, one out of the common order.

or rule, nor as presenting a sudden or unexpected occasion for action. It contemplates and makes reasonable provision for the delay caused by the supervention of extraordinary and unforeseeable conditions, and excludes the assumption that the work itself is one of continuing extraordinary emergency which wholly suspends the operation of the eight-hour law. When confronted with an "extraordinary emergency" within the meaning of the statute, the laborers and mechanics may be required or permitted to work overtime in protecting property during the emergency, but not afterwards for the purpose of minimizing the losses of the contractor. Paragraph 35 of the specifications of the contract provides that:

"It is expected that each prospective bidder will visit the site of the dam, and make such examination as will enable him to form his own conclusions respecting the bearing of local conditions on the proposed work; also that he will visit the U. S. engineer's office at Cincinnati where he may obtain valuable information respecting floods, high and low water periods, and other data concerning the general character of the river necessary for the preparation of intelligent proposal."

Paragraph 20 provides that:

"Bidders, or their authorized agents, are expected to examine the maps and drawings in this office, which are open to their inspection, to visit the locality of the work, and to make their own estimates of the facilities and difficulties attending the execution of the propopsed contract, including local conditions, uncertainty of weather, and all other contingencies."

Paragraph 31 provides that:

"The contractor will be required to commence work under the contract within thirty (30) days after the date of notification of approval of the contract by the Chief of Engineers, U. S. army, to prosecute the said work with faithfulness and energy and to complete it within three hundred and fifty (350) fair working days after the date of commencement."

Paragraph 47 provides that:

"In computing the fair working days (par. 31), allowance will be made for a total suspension of work from December 1 to June 1, and for all other days when work is stopped by ice, freshets, etc., including the necessary stoppage to protect or remove plant just before floods, and to pump out and replace plant after floods."

Paragraph 32 provides, among other things, that the department may—

"Waive for a reasonable period the time limit originally set for completion and remit the charges for expenses of superintendence and inspection for so much time as in the judgment of the said engineer officer in charge may actually have been lost on account of unusual freshets, ice, rainfall, or other abnormal force or violence of the elements, or by epidemics, local or state quarantine restrictions, or other unforeseeable cause of delay arising through no fault of the contractor, and which prevented him from commencing or completing the work or delivering the materials within the period required by the contract."

Paragraph 51 provides that:

"By continuous operation is meant, that excavation, filling, and laying of concrete masonry is to be carried on continuously during the 24 hours of each day (except Sundays and holidays) by three shifts of eight hours each."

Paragraph 50 provides that:

"In case of extraordinary emergency, to be determined by the U. S. engineer, work on Sundays or legal holidays may be required or permitted. Ordinarily it will not be permitted."

The defendant, as bidder on the contract, was required to visit the locality of the work, and to make its own estimates of the facilities and difficulties attending the execution of the contract, including uncertainty of weather and all other contingencies, and, to assist it in doing so, it was invited to visit the United States engineer's office at Cincinnati, where it could obtain valuable information respecting floods, high and low water periods, and other data concerning the general character of the river necessary for the preparation of intelligent proposal, before it entered into a contract. The contract required the defendant to complete the work within 350 fair working days, but in computing fair working days allowance was made for a total suspension of work from December 1st to June 1st, and for all other days when work was stopped by ice, freshets, etc., including the necessary stoppage to protect or remove plant just before floods and to pump out and replace plant after floods. And the department had authority to waive, for a reasonable period, the time limit originally set for completion, and to remit the charges for expense of superintendence and inspection for so much time as in the judgment of the said engineer officer in charge may actually have been lost on account of unusual freshets, ice, rainfall, or other abnormal force or violence of the elements, or by epidemics, local or state quarantine restrictions, or other unforeseeable cause of delay arising through no fault of the contractor, etc.

In short, reasonable provisions were made to meet and protect the defendant against the difficulties and hindrances incident to the work, which experience taught might be expected, but did not, as a remedy for these difficulties, contemplate or confer upon the defendant the privilege of working the men overtime, but only an extension of the time limit and a remission of charges for inspection, etc. Nevertheless, the contract also recognized the fact that extraordinary emergencies might arise, and, in addition to the overtime which might be required of the men under the statute, provided that they might also be required to work on Sundays and holidays. The contract, however, in recognition of the eight-hour law, also provided that, excepting Sundays and holidays and cases of extraordinary emergency, the work should be carried on continuously during the 24 hours of each day by three shifts of 8 hours each. Neither the law nor the contract justify the assumption that the work was one of continuing extraordinary emergency, or that a case of extraordinary emergency would cover the time employed in repairing the injuries, and in removing the obstacles caused by the flood. The phrase "continuing extraordinary emergency" is self-contradictory. A condition or conditions which necessarily must continue for years cannot be called an uncommon, sudden, unexpected happening, which presents a sudden and unexpected occasion for action.

(5) That the court erred in refusing to admit as evidence certain letters and documents offered by the defendant. The court refused to

admit as evidence the following letters, namely: The letter of George A. Zinn, dated August 30, 1904, addressed to Brig. Gen. George A. Mackenzie, chief of engineers, United States army, and marked: "Defendant's Rejected Exhibit No. 6." The letter of William P. Craighill, dated May 15, 1893, addressed to Zimmerman, Truax & Sheridan, and marked: "Defendant's Rejected Exhibit No. 7." Copies of general orders Nos. 7 and 9, dated, respectively, August 1, 1892, and October 15, 1892, from headquarters corps of engineers, and marked: "Defendant's Rejected Exhibits Nos. 8 and 9." The printed poster headed "100 Men Wanted," marked: "Defendant's Rejected Exhibit No. 13." The letter of the defendant, dated August 19, 1904, addressed to Maj. George A. Zinn, and marked: "Defendant's Rejected Exhibit No. 14." The letter of defendant dated August 25, 1906, addressed to the chief of engineers, United States army, and marked: "Defendant's Rejected Exhibit No. 15." The letter of defendant, dated August 15, 1906, addressed to chief of engineers, War Department, and marked: "Defendant's Rejected Exhibit No. 17." The letters and orders of 1892, 1893, and 1894 evidenced the construction given to the eight-hour law, during these years, by the officers of the corps of engineers, and by the War Department, and were offered as tending to show that the defendant in requiring or permitting the men to work overtime did not intend to violate the law, and were rejected by the court upon the ground that the defendant was, by the letters of August 20 and 29, 1906, advised that that construction of the law had been repudiated by the department. By the letter of August 20, 1906, the defendant was advised that:

"(1) Receipt is acknowledged of your letter of August 15, 1906, in reference to the recent action of the department relative to the eight hour law of August 1, 1892. (2) The chief of engineers has no discretion in the matter but is required to submit to the War Department a report in every case in which 'laborers and mechanics employed by any contractor or subcontractor upon any public works of the United States are now required or have been required in the past two years to work more than eight hours in a day.' Such report will include a statement as to the emergency, if any, under which this work was performed."

And by the letter of August 29, 1906, was advised that:

"This office has nothing to add to its letter of August 20th, except to say that it will not undertake to decide what constitutes an emergency under the law."

And the defendant was put on notice that it could no longer rely upon that construction of the law, by the failure of the department to give any other or further answer to the letters of August 15 and 25, 1906, than was given by the letters of August 20 and 29, 1906. This question was fully discussed by the court at the trial, as shown by the record. The ground of the refusal of the court to admit Exhibit No. 13 has already been given in its discussion of what constitutes an "extraordinary emergency" within the meaning of the statute.

The motion for a new trial will be overruled.