## MAYOR AND CITY COUNCIL OF BALTIMORE *v.* ALBERT C. HOFRICHTER ET AL. SAME *v.* ELLEN W. WALLER

[Nos. 3, 4, April Term, 1940.]

*Decided February 28th, 1940.*

The causes were argued, as of the January Term, before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL JOHNSON, and DELAPLAINE, JJ.

*Charles C. G. Evans, City Solicitor,* and *J. Francis Ireton, Assistant City Solicitor,* for the appellant.

*Charles C. Wallace,* for Albert C. Hofrichter and others, appellees.

*Edward J. Colgan, Jr.,* with whom was *Henry L. D. Standford, Jr.,* on the brief, for Ellen W. Waller, appellee.

JOHNSON, J., delivered the opinion of the Court.

The two appeals on this record are from decrees of the Circuit Court No. 2 of Baltimore City, declaring Ordinance No. 95 of of the Mayor and City Council of Baltimore, approved December 21st, 1939, invalid and ineffectual, and directing issuance of writs of injunction restraining appellant from issuing and selling certificates of indebtedness authorized thereby. The decrees

resulted from attacks upon the ordinance by two groups of residents and taxpayers of the city, after appellant had answered their bills of complaint, and after testimony offered by all the parties was heard orally by the chancellor. In principle the two cases are indistinguishable, for the contentions of the parties respecting the validity *vel non* of Ordinance No. 95 are in each case identical, which accounts for the fact that they are contained in one record.

The ordinance declares the existence of an emergency arising from the necessity of preserving the "health, safety and sanitary condition" of the city, and makes provision for elimination of the exposure of the people to the dangers of infectious diseases from raw sewage because of the lack of adequate sanitary sewerage facilities (1) in that part of the city lying between Eastern Avenue, the Patapsco River, the eastern boundary of the city as it existed immediately prior to 1918, and the present eastern boundary of the city, and (2) in and around that part of the city known as Brooklyn.

It provides for an increase of the city debt by issuing certificates of indebtedness not exceeding two and one-half million dollars, redeemable as therein provided, and for expenditure of the proceeds of the sale of such certificates of indebtedness in extending and improving the sanitary sewerage system of the city in the areas mentioned.

The ordinance was not submitted to the voters of the city and the indebtedness thereby intended to be created was not approved by them in accordance with the requirement of section 7, article 11 of the Constitution of Maryland. It follows, therefore, that in order to sustain the ordinance, it must be determined that an emergency exists, within the meaning of the exception in the article and section referred to, and section 6, sub-section 25-B, of the Baltimore City Charter, as enacted by chapter 5 of the Acts of the General Assembly, Special Session 1936, for it has been uniformally held that, subject only to the exception contained in Constitution, art. 11, sec. 7, no

94

debt can be created or credit involved in behalf of the city unless it first has the authorization of the General Assembly, and, secondly, the approval of a majority of the legal voters of the city after the question has been submitted pursuant to an ordinance. *Stanley v. Baltimore,* 146 Md. 277, 126 A. 151, 130 A. 181; *Baltimore v. Supervisors,* 156 Md. 196, 197, 143 A. 800; *Johnson v. Baltimore,* 158 Md. 93, 148 A. 209.

But while that method is the normal way to provide for a public loan, the exception saves to the city the right to "borrow any amount at any time to provide for any emergency arising from the necessity of maintaining the police, or preserving the health, safety and sanitary condition of the city, and may make due and proper arrangements and agreements for the renewal and extension, in whole or in part, of any and all debts and obligations created according to law before the adoption of this Constitution." And to the same effect is section 6, subsection 25-B, of the City Charter, which authorizes the city to borrow "any amount of money at any time to provide for any emergency arising from the necessity of maintaining the police or preserving the health, safety and sanitary condition of the City; to declare by ordinance, the existence of such an emergency, and provide, by ordinance, for the creation of municipal debt, * * * for such amount as may be required," etc.

In the cases before us the chancellor found that no emergency existed as contemplated by the constitutional and statutory provisions to which reference has been made and, therefore, decreed that Ordinance No. 95 was void and of no legal effect, and accordingly enjoined appellant, its officers, and agents, from acting in pursuance of its provisions.

The correctness of those decrees must depend upon two elements, viz: The proper definition to be given the word "emergency" as used in the constitutional exception and the statute, and whether facts have been shown to justify finding that such an emergency in fact existed.

It is claimed that the emergency arises because (a) of raw sewage in many cases being dumped into Colgate Creek and the Patapsco River, and (b) by reason of being allowed to overflow from cesspools which it is said do not function properly because of the non-porous quality of the soil, but conceded that the great danger therefrom is typhoid fever. But the proof shows that in the two areas, with a total population of 27,000 persons, the total was twenty-eight cases in eleven years from 1929 to 1939, inclusive, or one case per 966 persons, while, in the remainder of the city, the rate within the same period was one case per 1050 persons, so that, based upon experience, the difference in typhoid cases between those areas and the remainder of the city over the ten year period is practically negligible. The Dundalk section, except for normal growth, is in practically the same condition with reference to sanitary sewerage as in 1918, when both areas were taken into the city, but the Brooklyn section has to a great extent been supplied with sanitary sewers, and for the most part the remaining problem is to build a pumping station to pump the raw sewage to the disposal plant.

It is true that some of the witnesses expressed the opinion that an emergency existed. One of those was Dr. Huntington Williams, health commissioner of Baltimore City, but the doctor admitted that in the eleven year period there was but one case of typhoid which could be identified as having come from lack of sewerage facilities in the involved areas. This was in July, 1937, and the officer then wrote Mr. Crozier, of the City Planning Commission, complaining that sewerage conditions on Vail Street created an emergency. Be that as it may, nothing further seems to have been done about the matter until after Ordinance No. 923, providing for the issuance of bonds to raise money to supply adequate sewerage facilities for the areas under consideration, had, during May, 1939, been submitted to the voters of the city and was defeated.

And it may also be stated that, in none of the annual reports made by the health commissioner from July, 1937, to the city officials, was any mention made specifically of the existence of a health menace due to inadequate sewerage facilities in Dundalk or Brooklyn areas. It was also shown that the Vail Street section, about which much complaint is made, was something akin to an open ditch, and that raw sewage enters it from a public school constructed by the city within the past ten years, also that sewage enters from many dwellings under permits issued by the city authorities. Those considerations may not constitute a valid argument that an emergency does not exist, but they at least point to an inconsistency of the city officials who suffered the conditions of which they now complain, and it seems unreasonable to hold that at the Vail Street location they should, by issuing permits as well as by erection of a public school, allow a condition to come into being, and thus use the result of their own deliberate conduct to increase the public debt, contrary to the will of the people.

Dr. Abel Wolman, consulting engineer to the Maryland State Board of Health, gave the opinion that a menace existed which affected the health of the people in those sections; that an epidemic could very easily arise from unsanitary conditions existing in the two communities, but, like Dr. Williams, gave no explanation as to why the alleged emergency was not previously urged upon the Mayor and City Council. But such opinions, without an adequate and sufficient basis for them, are not controlling, and especially is this true when it is recalled that at no time did Dr. Wolman take any steps to compel the city to correct the conditions of which he now complains. While declining to state when the emergency arose, he testified that in his judgment it had existed two years or longer, yet he never recommended that the Maryland State Board of Health pass an order to correct the alleged menace, notwithstanding he contends they have ample authority so to do under chapter 810, Acts 1914. See, also, *Welch v. Coglan,* 126 Md. 1, 10, 94 A. 384; *Ludwig*

*v. Baltimore County,* 131 Md. 351, 352, 101 A. 695; and Code, art. 43, sec. 334.

It may also be stated that the sewerage system of Baltimore was established in 1904, from which time, until 1927, loans for sewerage purposes aggregating $51,000-000 were authorized and proceeds expended in the construction of a sewerage system and appurtenances, including a pumping station, a treatment and disposal plant. Of that sum a loan of $10,000,000 was made in 1905 (Acts 1904, chapter 349); an equal sum in 1911 (Acts 1910, chapter 630); $3,000,000 in 1914 (Acts 1914, chapter 323); $8,000,000 in 1920 (Acts 1920, chapter 373); $10,000,000 in 1924 (Acts 1924, chapter 222), and an equal amount in 1927 (Acts 1927, chapter 333). Since 1927 a loan of $5,000,000 was authorized (Acts 1931, chapter 416, amended by Acts 1935, chapter 119), but a portion thereof was disapproved by the voters, and none of that loan has been expended. Prior to the passage of Ordinance No. 95, no attempt was ever made to have an emergency declared for the purposes and under facts approaching those herein presented, which means that in the past, when confronted with problems similar to those under consideration, the city officials did not recognize or contend that the situation which confronted them was an emergency within the meaning of the constitutional exception, so as to authorize them to act in increasing the public debt without the consent of the taxpayers. And this long continued contemporaneous construction on their part is to some extent relevant in determining the existence *vel non* of an emergency, for it clearly shows the construction accorded the term by the authorities since it was first incorporated in the Constitution. *Norris v. Baltimore,* 172 Md. 667, at page 676, 192 A. 531; 6 *R. C. L.,* 62, 63; 12 *C. J.,* page 1315; and authorities there cited; 11 *Am. Jur.,* pages 697 to 701, inclusive.

Prior to 1867 only legislative sanction was required to enable the city to borrow money, and the prohibition against borrowing, except by an act of Legislature and

approval by the voters of the city, save in cases of emergency, first appeared in the Constitution of 1867. The inclusion of that prohibition in the State Constitution was undoubtedly to enable the people themselves to maintain a check upon the financial policies of their public officials, and thus protect themselves and their descendents against what they considered an unwarranted and unnecessary increases of the public debt. In his "Financial History of Baltimore," at page 45, Dr. Hollander observes that this clause was inserted in the Constitution of 1867, because of "lavish extension" of municipal aid to works of internal improvement and reckless contraction of indebtedness during and immediately after the Civil War. The object which the framers of our Constitution sought to accomplish by inserting the prohibition is relevant in arriving at a proper definition of the word "emergency" as used in the exception. See 11 *Am. Jur.*, page 675, and *Norris v. Baltimore, supra.* Could they have possibly contemplated an event or occasional combination of circumstances calling for such immediate action or remedy? Appellant contends that such a definition gratifies the manifest purpose of the exception, and relies upon 20 *C. J.*, at page 499, and the definition of "emergency" as found in *Webster's New International Dictionary.* It also seizes upon an expression used by this court in *Geisendaffer v. Baltimore,* 176 Md. 150, 3 A. 2nd 860, 862, 4 A. 2nd 460, wherein it is stated that "by reason of obstacles to the raising of the money by the ordinary processes, then, the need of replacement might present an emergency for which borrowing without delay, borrowing, that is, without proper approval, would be the only recourse."

In that case the ordinance directed issuance of certificates of indebtedness in excess of $4,000,000 to make relief for the destitute and unemployed in Baltimore City during the depression. It was held that the existence of an emergency was a question of fact; while a legislative finding of an emergency was usually sufficient, such a finding, although entitled to great weight, was not con-

clusive that the emergency in fact existed. We held, however, that an emergency was shown to exist within the exception contained in the Constitution, and accordingly sustained the ordinance. The facts in the two cases are so dissimilar as to render the quoted portion of the opinion inapplicable in the case before us.

*Norris v. Baltimore, supra,* is the latest case considered by us in connection with article 11, section 7, of the Constitution of the State, and chapter 5, 1st Special Session, 1936. There an obligation had been imposed upon the city by the Legislature to install voting machines for the use at future elections, and an ordinance was passed declaring the existence of an emergency under the constitutional provision and the act of the Legislature. The ordinance was upheld upon the ground that it was necessary to preserve the safety and enforce the law, and the duty of maintaining the police included the duty of regulating public elections. See, also, *United States v. Sheridan-Kirk Contract Co., D. C.,* 149 Fed. 809.

The definition cited in 20 *C. J.,* page 499, is by no means exclusive, for in addition appear the following: "Any event or occasional combination of circumstances which calls for immediate action or remedy; an unforeseen occurrence or combination of circumstances which calls for an immediate action or remedy; a sudden or unexpected occasion for action; a sudden or unexpected happening; any case of casualty or unavoidable accident; exigency; pressing necessity; specifically, a perplexing contingency or complication of circumstances."

And in *Webster's New International Dictionary* appears these additional definitions: "An unforeseen combination of circumstances which calls for immediate action; also, less properly, exigency." See, also, *The New Century Dictionary,* where the definition is given as "an unforeseen occurrence; a sudden and urgent occasion." Also, 1 *Bouv. Law Dict.* (Rawle's Third Revision), p. 1008, where the definition is given as "an unforeseen occurrence or condition."

The varying definitions of the word "emergency" are sufficient to demonstrate that its meaning to a great extent is controlled by the circumstances under which it is used. In view of the purpose of the constitutional provision that the public debt be not increased, save by the approval of the voters themselves, except in an emergency, we think it clear that the proper definition of the word, as here used, must mean a sudden, unexpected, and unforeseen condition or occurrence in municipal affairs of such public gravity and exigency as to require forthwith municipal action for which the requisite public money is not presently procurable by the usual and regular methods of acquiring funds for municipal use. Indeed, to hold that an emergency was anything less would give the word a meaning entirely foreign to the objects and purposes in which it is here used, thereby depriving the people of the protection which it was intended to afford them.

While we do not intend to imply that sanitation in the Dundalk or Brooklyn sections is good, nor indeed what it should be, no sufficient facts are shown to justify a holding that an emergency in fact exists.

It follows from what has been said that we agree with the decision of the chancellor that no emergency exists in the constitutional sense, and that his decrees to that effect were proper and must be affirmed.

*Decree in No. 3 affirmed; decree in No. 4 affirmed; with costs to appellees in each case.*