718 P.2d 1129

IDAHO STATE AFL-CIO, an unincorporated association: James E. Kerns, individually, and as President of the Idaho State AFL-CIO; International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America Local 983; United Transportation Union Local 78; International Brotherhood of Electrical Workers, Local 449; Brotherhood of Painters and Allied Trades, Local 764; Oil, Chemical and Atomic Workers Union Local 2632; Boise City Typographical Union Local 271; Idaho American Postal Workers Union; H. Fred Liebenau, individually and in his capacity as a member and president of the Boise City Typographical Union Local No. 271; Glen Hatch individually, and in his capacity as a member and president of the Brotherhood of Painters and Allied Trades Local Union No. 764; Leland Raymond, individually, and in his capacity as a member and officer of United Transportation Union Local 78; Rex Cherry, individually, and in his capacity as a member and business manager of International Brotherhood of Electrical Workers Local 449; Carter L. Wilson III, individually, and in his capacity as a member and president of Idaho American Postal Workers Union; Steven H. Gentry, individually, and in his capacity as a member and president of Oil, Chemical and Atomic Workers Local 2632; Paul McKendrick, individually, and in his capacity as secretary-treasurer of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 983; and Warbonnet Electric, Inc., an Idaho corporation; Plaintiffs-Respondents, Cross-Appellants,

v.

David LEROY, in his capacity as President of the Idaho Senate, and his delegates; Tom Stivers, in his capacity as Speaker of the Idaho House of Representatives, and his delegates; Pete Cenarrusa, as Secretary of State for the State of Idaho; Jim Jones, as Attorney General of the State of Idaho; Shawn Anderson, as Bannock County Prosecuting Attorney and on behalf of all those similarly situated, their successors and assigns, Defendants-Appellants, Cross-Respondents.

No. 16074.

Supreme Court of Idaho.

Jan. 29, 1986.

Rehearing Denied May 21, 1986.

Jim Jones, Atty. Gen., P. Mark Thompson, Deputy Atty. Gen., Boise, for defendants-appellants, cross-respondents.

Patricia L. McDermott, Douglas James Balfour, and Gaylen L. Box, Pocatello, for plaintiffs-respondents, cross-appellants.

DONALDSON, Chief Justice.

On January 31, 1985 the Idaho Legislature overrode the Governor's veto and enacted H.B. 2, a "right to work" bill. The bill was designated as an "emergency bill" pursuant to art. 3, § 22 of the Idaho Constitution which allowed the legislature to thereby render it immediately effective.

That same day, the plaintiffs filed a complaint and motion in Sixth Judicial District Court, Bannock County, for a temporary restraining order and a preliminary injunction to enjoin (1) defendants David Leroy, in his capacity as President of the Idaho Senate, and Tom Stivers, in his capacity as Speaker of the Idaho House of Representatives, from authenticating the bill as law; (2) defendant Pete Cenarrusa, Idaho Secretary of State, from filing or certifying the bill as law; and (3) defendants Jim Jones, Idaho Attorney General, and Shawn Anderson, Bannock County Prosecuting Attorney, on behalf of all prosecuting attorneys of Idaho similarly situated, from taking any action to enforce the provisions of the bill.

Plaintiffs are labor organizations, officers and members of those organizations, and an employer of union labor. Defendants, as noted above, are legislative officers, the Secretary of State, the Attorney

General, and the prosecuting attorneys of the state of Idaho.

The complaint charges that H.B. 2 would prevent plaintiffs from continuing to enjoy the protection of collective bargaining agreements or entering into new collective bargaining agreements, thereby abrogating valuable property rights and irreparably damaging plaintiffs; that H.B. 2 would abrogate federally guaranteed rights; that H.B. 2 violates the supremacy clause of the United States Constitution; that H.B. 2 violates the plaintiffs' constitutional rights of assembly and freedom of speech; that H.B. 2 violates the equal protection clause of the United States Constitution; that H.B. 2 violates the United States Constitution and the Idaho Constitution in that it impairs the obligation of contract; that plaintiffs are deprived of property rights without due process of law in violation of the constitutions of the United States and the state of Idaho; and lastly, that the emergency clause contained in H.B. 2, which purports to make H.B. 2 effective upon its passage, impairs plaintiffs' constitutional right under the referendum provision of art. 3 § 1 of the Idaho Constitution. Plaintiffs further allege that the declaration of emergency in H.B. 2 was ineffective, invalid and void since no such emergency actually existed.

We emphasize that the only portion of plaintiffs' complaint which is presently before this Court is that relating to the validity of the emergency clause in H.B. 2 and the temporary restraining order and preliminary injunction issued by the district court based on the alleged invalidity of the emergency clause.

Upon filing of plaintiffs' complaint, Judge George Hargraves of the Sixth Judicial District Court issued a temporary restraining order and set a hearing on the preliminary injunction for February 5, 1985. Judge Hargraves then referred the case to Judge Dell Smith in Bannock County for final determination.

The defendants then filed a petition for a writ of prohibition with this Court to prevent Judge Hargraves or Judge Smith from enforcing the temporary restraining order. On February 1, 1985, this Court issued an order and alternative writ staying the enforcement of the temporary restraining order against defendant Cenarrusa. This Court did not, however, stay the hearing on the motion for preliminary injunction set for February 5.

Before the hearing, defendants moved for a change of venue to Ada County pursuant to I.C. § 5–402. On February 5, 1985, the hearing to show cause was held before Judge Smith on the preliminary injunction. The next day, defendants moved to strike the testimony and evidence presented at the hearing since plaintiffs failed to give sufficient notice to defendants of their intent to produce testimony and evidence at the hearing. Defendants also argued that their motion for a change of venue had to be determined before any other proceedings. Defendants then moved to stay all proceedings until the court ruled on their motion for change of venue.

Defendants' motion for a stay was denied and further hearings were held on February 12. The next day, Judge Smith denied defendants' motion to strike, but granted their motion for a change of venue to the Fourth Judicial District, Ada County. The judge also extended the temporary restraining order against defendants Jones, Anderson and all prosecuting attorneys in Idaho for fourteen additional days.

On February 14, 1985, plaintiffs moved in Fourth Judicial District Court for a preliminary injunction or extension of the temporary restraining order beyond the February 27th deadline. A hearing was held before Judge Robert Newhouse on February 27 at which time he extended the temporary restraining order until further order of the court.

On April 5, 1985, defendants answered plaintiffs' complaint for injunctive and declaratory relief and, along with other defenses, challenged the jurisdiction of the court to review the legislature's declaration of an emergency.

On May 14, 1985, Judge Newhouse issued his Memorandum Decision in which he interpreted art. 3, § 22 (the power of the legislature to declare an emergency in the preamble or body of an act) and art. 3, § 1 (the power of the people to demand a referendum on any act passed by the legislature) of the Idaho Constitution. Judge Newhouse concluded that the legislature's declaration of emergency would defeat the voters' right to a referendum. Therefore, he granted the preliminary injunction until such time as a trial could decide whether the legislature acted improperly by enacting the emergency provision.

On May 23, 1985, the defendants filed a petition for a writ of prohibition with this Court against Judge Newhouse. This Court denied the petition but granted permission to the defendants to file an appeal of Judge Newhouse's decision pursuant to I.A.R. 12. This Court further ordered that Judge Newhouse's preliminary injunction would continue in full force and effect until further order of this Court.

On July 1, 1985, defendants filed their Notice of Appeal seeking a determination whether the legislature's declaration of emergency in an act is immune from judicial review. On July 15, plaintiffs filed a Notice of Cross-Appeal seeking a determination whether Judge Smith erred when he ordered a change of venue from Bannock County to Ada County; and whether Judge Newhouse erred when he ordered a trial to decide if an emergency actually existed when H.B. 2 was passed, where the legislative record on the bill was already before the Court.

For the reasons set forth below, we affirm the change of venue granted by Judge Smith of the Sixth Judicial District, vacate the preliminary injunction issued by Judge Newhouse of the Fourth Judicial District, and remand for further proceedings on plaintiffs' claims not raised in this appeal.

## I.

Legislative Declarations of Emergency

■ The central issue on this appeal is whether the courts, in the particular circumstances of this case, may properly review the legislature's declaration of emergency in legislation it passes. This issue touches on seemingly conflicting provisions of the Idaho Constitution and the Idaho Code. Our analysis must be made in light of the doctrine of the separation of powers among co-equal branches of government as well as the extent to which the Idaho Constitution provides for a retention of certain powers by the people.

Article 2, § 1 of the Idaho Constitution reads:

"**Departments of government.**—The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted."

The authority to determine the effective date of any act passed by the legislature is vested exclusively in the legislature pursuant to art. 3, § 22 of the Idaho Constitution. That section reads:

"**When acts take effect.**—No act shall take effect until sixty days from the end of the session at which the same shall have been passed, except in case of emergency, which emergency shall be declared in the preamble or in the body of the law."

In *Johnson v. Diefendorf,* 56 Idaho 620, 635, 57 P.2d 1068, 1083 (1936) (hereinafter *Johnson*), this Court noted that in case of emergency, which is declared to exist in the preamble or in the body of the act, "it is left to the discretion of the legislature to fix the time when it shall go into effect." We noted, in addition, that, "The language employed in art. 3, sec. 22, leaves no room for any other interpretation." *Id.* at 635–36, 57 P.2d at 1083–84.

*Johnson* is almost dispositive of this issue, save for the fact that we noted, "Whether it is for the legislature or the

court to say, finally, as to the existence of an emergency within the meaning of the constitution, is not before us. It was stipulated at the trial, in substance, that an emergency existed for the enactment of this law." *Id.* at 638, 57 P.2d at 1086.

The language of *Johnson,* however, must be read in conjunction with a case that preceded it by four years which also addressed determinations of emergency, *Diefendorf v. Gallet,* 51 Idaho 619, 10 P.2d 307 (1932) (hereinafter *Gallet* ). In *Gallet* we found that the judiciary cannot second-guess the governor's determination that a sufficient emergency exists to justify calling an extraordinary session of the legislature. We also found that the judiciary cannot second-guess the legislature's determination that a sufficient emergency exists to justify dispensing with the constitutional requirement that before an act may be passed it must be printed and read on three separate days in each house. *Id.* at 638–39, 10 P.2d at 326–27; *see* ID. CONST. art. 3, § 15.

In *Gallet* we said,

"The determination as to whether facts exist such as to constitute 'an extraordinary occasion' is for him [the governor] alone to determine. The responsibility and the discretion are his, not to be interfered with by any other co-ordinate branch of the government.

" 'It would be an unprecedented proceeding for the court to entertain a controversy wherein proof is offered to ascertain judicially whether an extraordinary occasion existed of sufficient gravity to authorize the governor to convene the legislature in extra session. The character of the legislation to be considered by the legislature was by the constitution left to the governor, and a review of such a discretionary act of the governor should not be done by the courts.' (*Utah Power & Light Co. v. Pfost,* 52 Fed. (2d) 226.)

" 'It was the exclusive province of the governor, under the constitution, to determine whether an occasion existed of sufficient gravity to require an extra session of the legislature, and his conclusion in that regard is not subject to review by the courts. *Farrelly v. Cole,* 60 Kan. 356, 56 Pac. 492, 44 L.R.A. 464.' (*State v. Fair,* 35 Wash. 127, 102 Am.St. 897, 76 Pac. 731.)" *Gallet, supra* at 638–39, 10 P.2d at 326–27.

The decision that a legislative bill is so urgently and immediately needed as to justify a declaration of emergency is a decision-making function that is uniquely legislative. The courts are ill equipped to make such policy decisions. Borrowing from the analogous reasoning of the U.S. Supreme Court in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), it is clear that there is a textually demonstrable constitutional commitment to the legislature of the issue of determining whether a sufficient emergency exists to necessitate immediate effectuation of legislation. The language of art. 3, § 22 and its interpretation in *Johnson* and *Gallet* bears this out. The respect due to the co-equal and independent legislative branch of state government and the need for finality and certainty about the status of a duly enacted statute contribute to the reluctance of the courts to inquire into whether the legislature's determination of an effective date is justified. *Cf. Baker, supra* at 214–15, 82 S.Ct. at 708–09.

Similarly, there is a lack of judicially discoverable and manageable standards for resolving the problem of what events must exist to constitute a sufficient emergency such that legislation directed to alleviate that emergency can justifiably become immediately effective. For a court to undertake its own independent resolution of such policy determinations creates the potential for embarrassment from multifarious pronouncements by different branches of government on one question. *Cf. Baker, supra* at 217, 82 S.Ct. at 710.

In *Gallet,* we noted,

"The motives which prompted the governor of a state to take such action or to make such determination are not proper subjects of judicial inquiry. Such inquiry would be opposed both to the plainest

principles of public policy and the freedom of action by the executive within the constitutional authority of that department of government." *Gallet, supra* at 639, 10 P.2d at 327 (quoting *In re Moyer,* 12 Idaho 250, 85 P. 190 (1906)). We then stated, "The identical reasoning applies to the determination of urgency by the legislature." *Gallet, supra* at 639, 10 P.2d at 327.

■ We are bound to respect the reasonable exercise by the legislature of powers expressly delegated to it by the constitution of this state, and in the absence of other constitutional offense cannot interfere with it. *Id.* at 635, 10 P.2d at 323. This is a fundamental concept of American government and is embodied in our own constitution. *Id.*; ID. CONST. art. 2, § 1.

■ If there were no other "constitutional offense" involved in this case, then our inquiry, as in *Gallet,* could end at this point. However, at the heart of this case is the resolution of the apparent conflict between the legislature's constitutional authority to render legislation immediately effective, and the constitutional right of the voter to approve or reject any act passed by the legislature through the referendum process. The relevant constitutional provision on the right of referendum is art. 3, § 1 of the Idaho Constitution, which reads:

"§ 1. **Legislative power—Enacting clause — Referendum — Initiative.—The** legislative power of the state shall be vested in a senate and house of repre-

sentatives. The enacting clause of every bill shall be as follows: 'Be it enacted by the Legislature of the State of Idaho.'

"The people reserve to themselves the power to approve or reject at the polls any act or measure passed by the legislature. This power is known as the referendum, and legal voters may, under such conditions and in such manner as may be provided by acts of the legislature, demand a referendum vote on any act or measure passed by the legislature and cause the same to be submitted to a vote of the people for their approval or rejection.

"The people reserve to themselves the power to propose laws, and enact the same at the polls independent of the legislature. This power is known as the initiative, and legal voters may, under such conditions and in such manner as may be provided by acts of the legislature, initiate any desired legislation and cause the same to be submitted to the vote of the people at a general election for their approval or rejection."

Our constitutional provision for referendum differs from all others we have examined [1] and both parties at oral argument concede that the language of art. 3, § 1 is unique to our state. *See Johnson, supra* at 634, 57 P.2d at 1082. Many other state constitutions which provide the voters with the right to approve or reject laws referred to them, specify only certain types of laws which can or cannot be referred.[2] Our constitution, on the other hand is very broad in

---

1. Not all state constitutions provide their citizens with the right of referendum as does Idaho. Those state constitutions which do provide such a right, which we have examined, are: ALASKA CONST. art. XI, § 1; ARIZ. CONST. art. IV, pt. I, § 1; ARK. CONST. art. V, § 1, amend. 7; CAL. CONST. art. IV, § 23a; COLO. CONST. art. V, § 1; KY. CONST. § 171; ME. CONST. art. IV, pt. I, § 1; MD. CONST. art. XVI, § 2; MASS. CONST. art. XLVIII; MICH. CONST. art. II, § 9; MO. CONST. art. III, § 49; MONT. CONST. art. V, § 1; NEB. CONST. art. III, § 3; NEV. CONST. art. XIX, § 1; N.M. CONST. art. IV, § 1; N.D. CONST. art. II, § 25, amend. 26; OHIO CONST. art. II, § 1; OKLA. CONST. art. V, § 1; OR. CONST. art. IV, § 1;

S.D. CONST. art. III, § 1; UTAH CONST. art. VI, § 1; WASH. CONST. art. II, § 1.

2. Those state constitutional provisions which specifically enumerate the types of laws that may be made subject to a referendum and/or specifically exclude certain types of laws that cannot be referred to the voters are: ALASKA CONST. art. XI, § 7; ARIZ. CONST. art. IV, pt. I, § 1(3); ARK. CONST. art. V, § 1, amend. 7; CAL. CONST. art. IV, § 23a; COLO. CONST. art. V, § 1; KY. CONST. § 171; ME. CONST. art. IV, pt. III, §§ 16 & 17; MD. CONST. art. XVI, § 2; MASS. CONST. art. XLVIII, Ref. III, § 2; MICH. CONST. art. II, § 9; MO. CONST. art. III, § 52a; MONT. CONST. art. V, § 1; NEB.

that the people have "the power to approve or reject at the polls *any* act or measure passed by the legislature." (Our emphasis). However, this right of referendum in Idaho is *not* self-executing,[3] *Johnson, supra* at 636, 57 P.2d at 1084, and in fact, was dormant and inoperable for 21 years until 1933 when the legislature passed Chapter 18 of Title 34 of the Idaho Code.

The pertinent provision of this referendum enabling legislation at issue here is I.C. § 34–1803 which states,

> "**34–1803. Referendum petitions—Time for filing—When election held—Effective date of law.**—Referendum petitions with the requisite number of signatures attached shall be filed with the secretary of state not more than sixty (60) days after the final adjournment of the session of the state legislature which passed on the bill on which the referendum is demanded. All elections on measures referred to the people of the state shall be had at the biennial regular election. Any measure so referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise. [1933, ch. 210, § 3, p. 431.]"

Some states have language similar to the last sentence of this statute in their constitutional provisions for referendum. In Idaho, such language has not been included in art. 3, § 1 and, as we stated in *Johnson*, "In Idaho that is a statutory provision which, if it was intended to prevent the legislature from making emergency laws effective immediately upon their approval by the governor, is in conflict with the part of the constitution which relates to

emergency laws, and it is ineffectual to prevent what the constitution has provided for." *Johnson, supra* at 635, 57 P.2d at 1083.

The possible conflict which we must resolve is, therefore, actually between the legislature's *constitutional* authority to declare emergencies and the language of a *statute* which says any measure referred to the people shall take effect "when it is approved by a majority of the votes cast thereon, and not otherwise." Those last three words and the dilemma they present in light of the language relating to the legislature's constitutional authority to declare an emergency was addressed in *Johnson* wherein this Court stated:

> "What is meant by the last sentence of that section? Is it to be construed to mean that, although the constitution reserves to each legislative session the right when emergency for the enactment and operation of a law arises, to fix the time when such law shall become effective and, when necessary, make it effective immediately upon its approval by the governor, the 1933 session could, nevertheless, fix the date when emergency laws submitted to referendum vote shall become effective when they are approved by a majority of the votes cast thereon and not otherwise? To so hold is to decide that the 1933 session of the legislature has substituted its wisdom and decision for that of future sessions, with respect to future emergencies, and has amended the constitution and deprived its successors of the power to make laws, for the enactment and operation of which emergencies exist, effective when ap-

CONST. art. III, § 3; N.M. CONST. art. IV, § 1; OHIO CONST. art. II, § 1c & d; OKLA. CONST. art. V, § 2; OR. CONST. art. IV, § 1; S.D. CONST. art. III, § 1; UTAH CONST. art. VI, § 1(2); WASH. CONST. art. II, § 1b.

**3.** By contrast, many state constitutions which grant to the people the right of referendum specifically indicate that such a right is self-executing which the legislature cannot prohibit or restrict. *See.* ARIZ. CONST. art. IV, pt. I, § 1; ARK. CONST. art. V, § 1, amend. 7; COLO. CONST. art. V, § 1; MD. CONST. art. XIV, § 1b;

MASS. CONST. art. XLVIII, Gen. Prov. VII; NEB. CONST. art. III, § 4; NEV. CONST. art. XIX, § 5; N.D. CONST. art. II, § 25, amend. 26; OHIO CONST. art. II, § 1g; OR. CONST. art. II, § 18; WASH. CONST. art. II, § 1d. The plaintiffs' argument relies heavily on the case of *State ex rel. Brislawn v. Meath,* 84 Wash. 302, 147 P. 11 (1915) and cases of other jurisdictions that followed its reasoning. Since Washington's referendum provision is qualitatively different from Idaho's, particularly in that the former is self-executing and the latter is not, plaintiffs' line of cases are readily distinguishable.

proved by the governor. A legislative session is not competent to deprive future sessions of powers conferred on them, or reserved to them, by the constitution." *Johnson, supra* at 636, 57 P.2d at 1084.

■ If the statutory language relating to referendum were to be construed as asserted by the plaintiffs, the constitutional authority of the legislature to declare an emergency and thereby make legislation effective immediately, would be rendered a nullity. Where two constructions of a statute are possible, one resulting in the statute being constitutional and the second rendering the statute unconstitutional, we will construe the statute, *i.e.*, I.C. § 34–1803, so as to avoid conflict with the constitution. *Id.* As we stated in *Johnson,* "where there is room for two constructions of a statute, both equally obvious and equally reasonable, the court must, in deference to the legislature of the state, assume that it did not overlook the provisions of the constitution and designed the act to take effect." *Id.* at 637, 57 P.2d at 1085, (quoting *Grice v. Clearwater Timber Co.,* 20 Idaho 70, 117 P. 112 (1911)).

■ The legislature of the state is authorized by the constitution to declare an emergency and thereby render an act effective immediately upon its passage. The people of the state of Idaho are statutorily authorized to approve or reject that legislation at the next biennial election. Hence, H.B. 2 is, and will continue to be, effective until at least November 4, 1986, and thereafter only if approved by the voters. The filing of a petition to refer to the voters an act passed by the legislature cannot operate to prevent the act from becoming immediately effective if the legislature has declared an emergency in the body or preamble of the act. Similarly, the legislature, by its declaration of an emergency, making an act effective immediately, cannot thereby prevent the act from being referred to the people for their approval or rejection at the next biennial election.

■ Plaintiffs' ultimate assertion is that the events which precipitated the enactment of H.B. 2 did not rise to the level of an actual emergency. Whether this is true or not, we hold that the legislature's determination of an emergency in an act is a policy decision exclusively within the ambit of legislative authority, and the judiciary cannot second-guess that decision. In the absence of a legislative invasion of constitutionally protected rights, the judicial branch of government must respect and defer to the legislature's exclusive policy decisions. Such is the very nature of our tripartite representative form of government.

We therefore vacate the preliminary injunction imposed on the defendants by the district court, since it was based on the erroneous assumption that the courts could probe into the legislature's justification for declaring an emergency in 1985 H.B. 2.

We remand, however, to the district court for further determination of the plaintiffs' other claims, none of which were a subject of this appeal.[4]

## II.

### Venue

■ Judge Smith of the Sixth Judicial District Court determined at the onset of this case that the basis of plaintiffs' cause of action was the allegedly improper declaration of emergency in H.B. 2, which arose in Ada County, where the legislature was sitting. Therefore, Judge Smith granted the defendants' motion for a change of venue from Bannock County to Ada County pursuant to I.C. § 5–402. That provision reads

---

4. As noted above, the plaintiffs filed a comprehensive 21-page complaint arguing among other things, that H.B. 2 has been preempted by federal law, that it is a violation of plaintiffs' first amendment rights of free speech and assembly, that it is unconstitutionally vague and over-broad, and that it grants civil remedies to only one of two classes of persons created by the statute. There has been no determination at the district court level as to the merits of these claims, or whether they justify relief, injunctive or otherwise.

"5–402. **Actions for penalties and against officers.**—Actions for the following causes must be tried in the county where the cause, or some part thereof, arose, subject to the like power of the court to change the place of trial:

"1. For the recovery of a penalty or forfeiture imposed by statute, except, that when it is imposed for an offense committed on a lake, river or other stream of water, situated in two (2) or more counties, the action may be brought in any county bordering on such lake, river or stream, and opposite to the place where the offense was committed.

"2. Against a public officer, or person specially appointed to execute his duties, for any act done by him in virtue of his office; or against a person who, by his command or in his aid, does anything touching the duties of such officer."

The second subsection of this statute is the applicable part in this case.

The defendants in this case are all public officers and the passage of an emergency clause in H.B. 2 gave rise to immediate duties those officers were to perform by virtue of their office. Those duties, of course, were not the actual voting on the bill, but rather arose as a consequence of the passage of a piece of emergency legislation, *i.e.*, signing, certifying and immediately—as opposed to the normal delayed—enforcing the legislation. Plaintiffs' dominant cause for seeking to enjoin the defendants from fulfilling those duties was based on the allegedly improper passage of the bill with an emergency clause for which no emergency allegedly existed. Hence, the legislature's authority to pass emergency legislation was the main action which caused plaintiffs' claim for injunction to arise. Recognizing this, Judge Smith correctly looked to and applied I.C. § 5–402(2) to determine the proper venue · for this cause of action. We affirm that decision.

As to those portions of the complaint which remain to be determined against the remaining defendants, we need not, and do not, herein decide the proper venue therefor. On remand, our affirmation of the change of venue to Ada County does not preclude any future motions for change of venue upon a showing of appropriate circumstances.

Costs to appellant.

No attorney fees on appeal.

SHEPARD, BAKES and HUNTLEY, JJ., concur.

BISTLINE, Justice, dissenting.

I.

A sound appellate practice is to begin with an analysis of the opinion authored by the district court in this case the Honorable Robert G. Newhouse. Judge Newhouse, conceding that he would have preferred that some other judge had to come to grips with the legislature's House Bill No. 2, courageously performed the judicial function of the constitutional office of district judge to which the people have elected him. Observing that it is ordinarily the province of the legislature to determine if there is *actually* an emergency (*see Johnson v. Diefendorf*, 56 Idaho 620, 57 P.2d 1068 (1936), he succinctly stated that it was the evidence submitted to him which established a serious question as to whether in fact an emergency had in fact existed when the legislature simply declared an emergency without expressing any facts whatever by which such a conclusion could have been reached. "Thus such is a question of fact which must be determined at trial." R., p. 159. Not deigning to deal in the abstract, Judge Newhouse dealt with the reality of the Idaho Constitution:

4. Article 3, § 22 of the Constitution of the State of Idaho provides that no act of the Idaho Legislature shall take effect until 60 days from the end of the legislative session, except in the case of an emergency, which emergency shall be declared in the preamble or in the body of the law. This court can only interpret this constitutional provision to mean an actual emergency must exist not just wishful thinking.

5. Legal voters may, under the Idaho Constitution, Art. 3, § 1, under such conditions and in such manner as may be provided by the acts of the Legislature, demand a referendum vote on any act or measure passed by the legislature and cause the same to be submitted to a vote of the people for their approval or rejection. The voters thus have a constitutional right to a referendum.

6. In order to carry out this referendum provision of the Idaho Constitution, the Legislature enacted 34-1801, and following, of the Idaho Code. Under 34-1803 I.C. the law provides that these referendum petitions may be filed not more than 60 days after the final adjournment of the Legislature. The statute specifically states that "Any measure so referred to the people shall take effect and become a law when it is approved by a majority of the votes cast therein, and not otherwise." So, if there is no emergency, a referendum stays the enforcement of the Right to Work Law.

7. All are bound by the Idaho State Constitution, not only the legislature, but the unions, the public, elected officials, and this court. There are no exceptions. No other conclusion can be reached by this court than that the emergency declared by the legislature will defeat the voter's right to a referendum deciding whether or not they should retain this "Right to Work" bill. If there is no emergency then the legislature improperly enacted this emergency provision. Only a trial will decide. A preliminary injunction should be granted the plaintiffs until this trial. R., p. 159.

The evidence which had been submitted included the filed affidavits of a state representative and a state senator, as well as minutes of the House and Senate committee meetings and hearings, demonstrating that *there was, in fact, no consideration*

*or mention of any such emergency during the bill's course through the Idaho legislature.* There is no contention to the contrary.[1] Judge Newhouse's views are patently sound. Hence, I am, as he will be, at a loss to understand why it is that the Court has sought an avenue of escape from upholding Judge Newhouse—which course of action is on the part of this Supreme Court is clearly mandated.

For myself, I was blessed with a fifth grade teacher who founded me with a good comprehension of the English language, and a junior high civics teacher who thoroughly understood the Constitutions of Idaho and the United States; presumably Judge Newhouse was equally blessed. The issue which has been squarely presented to us only indirectly involves the parties plaintiff and defendant. They serve the purpose of providing the format by which this Court, the Court of Highest and Last Resort in Idaho, will resolve whether the political power vested in the legislature by the people is paramount to the political power of the people reserved to themselves—which they are constitutionally empowered to assert through the referendum and through the initiative. More simply put, this Court is asked to *and is required* to make the determination as to which, if either, has the greater political power; is it the people? or is it the legislature?

Otherwise put, the proposition before the Court is NOT whether the Court would be in a violation of the doctrine of separation of powers by deciding this confrontation of those two political powers. The *real issue* will be decided in the courts, or it will go by default to the legislature. Judge Newhouse did not see that the issue could be avoided, nor did he delay meeting it head-on. Of that the *real issue* is the proper concern of the courts there can be no doubt.

---

1. Defendants, Leroy et al., argue in their November 1, 1985 brief, pp. 36–37, that "should this Court conclude that judicial review of the existence of an emergency is appropriate, cross-respondents must then be afforded an opportunity to present evidence as to the existence of an emergency at the time of the passage of H.B. 2," and that there is a "settled rule of construction which allows an Idaho court to review extrinsic evidence in attempting to gauge legislative intent."

Attorney General Jones, in his eloquent presentation of oral argument, showed his acquaintance with the noted work of the French political scholar, M. DeTocqueville, *Democracy in America.* In commenting on the use of the referendum, the attorney general described this as "tyranny of the minority":

It would be a strange rule indeed which would allow ten percent of the voters to suspend the effectiveness of a measure which the legislature, by a two-thirds vote, determined was an emergency measure that had to go into effect immediately until the next general election. In this case, if that is the allowable rule, if they can suspend its effectiveness, it will have been suspended for a period of 21 months. Mind you, ten percent of the voters are doing it under the constitutional referendum provision, even though two-thirds of the elected representatives said this is an emergency and we have to have this legislation now. What that amounts to is giving, in 1982, 32,653 voters, ten percent of the number of people that voted for governor—you're giving 32,000 some odd people the ability to overrule the entire legislature, which is the people's elected body.

While DeTocqueville wrote instead of the "tyranny of the *majority*" in American democracy,[2] his use of the phrase led me into another perusal of the French author's comprehensive analysis of why our forms of federal and state governments have survived and will survive. I submit these excerpts from Volume I, Chapter VI:

I am aware that a similar right [of judicial review of legislation] has been claimed—but claimed in vain—by courts of justice in other countries; but in America it is recognised by all the authorities; and not a party, nor so much as an individual is found to contest it. This fact can only be explained by the principles of the American constitution. in France the constitution is (or at least is supposed to be) immutable; and the received theory is that no power has the right of changing any part of it. In England, the parliament has an acknowledged right to modify the constitution; as, therefore, the constitution may undergo perpetual changes, it does not in reality exist; the parliament is at once a legislative and a constitutent assembly. The political theories of America are more simple and more rational. An American constitution is not supposed to be immutable as in France; nor is it susceptible of modification by the ordinary powers of society as in England. It constitutes a detached whole, which, as it represents the determination of the whole people, is no less binding on the legislator than on the private citizen, but which may be altered by the will of the people in predetermined cases, according to established rules. *In America the constitution may, therefore, vary, but as long as it exists it is the origin of all authority, and the sole vehicle of the predominating force.*

It is easy to perceive in what manner these differences must act upon the position and the rights of judicial bodies in the three countries I have cited. If in France the tribunals were authorized to disobey the laws on the ground of their being opposed to the constitution, the supreme power would in fact be placed in their hands, since they alone would have the right of interpreting a constitution, the clauses of which can be modified by no authority. They would, therefore, take the place of the nation, and exercise as absolute a sway over society as the inherent weakness of judicial power would allow them to do. Undoubtedly, as the French judges are incompetent to declare a law to be unconstitutional, the

**2.** "Tyranny of the majority" is discussed in Volume One, beginning at p. 280. At p. 294, the author quotes from Jefferson's letter to Madison:

The executive power in our government is not the only, perhaps not even the principal object of my solicitude. The tyranny of the legislature is really the danger most to be feared, and will continue to be so for many years to come.

power of changing the constitution is indirectly given to the legislative body, since no legal barrier would oppose the alterations which it might prescribe. But *it is better to grant the power of changing the constitution of the people to men who represent* (however imperfectly) *the will of the people, than to men who represent no one but themselves.*

It would be still more unreasonable to invest the English judge with the right of resisting the decisions of the legislative body, since the parliament which makes the laws also makes the constitution; and consequently a law emanating from the three powers of the state, can in no case be unconstitutional. But neither of these remarks is applicable to America.

*In the United States the constitution governs the legislator as much as the private citizen: as it is the first of laws, it cannot be modified by a law; and it is therefore just that the tribunals should obey the constitution in preference to any law. This condition is essential to the power of the judicature; for to select that legal obligation by which he is most strictly bound, is the natural right of every magistrate.*

. . . .

*. . .* But the American judge is brought into the political arena independently of his own will. He only judges the law because he is obliged to judge a case. *The political question which he is called upon to resolve is connected with the interest of the parties, and he cannot refuse to decide it without abdicating the duties of his post. He performs his functions as a citizen by fulfilling the strict duties which belong to his profession as a magistrate. Id.* at 103–105 (emphasis added) (footnotes omitted).

The careful reader will see an amazing resemblance in the language used by Judge Newhouse in his memorandum decision, page 18 above, and that of M. DeTocqueville written over one hundred fifty years ago. In the meantime, nothing has changed. One will also see a striking similarity in the language of Justice Harlan in his separate opinion in *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205, 210 (1887), close in time to the era of DeTocqueville. Justice Harlan wrote:

There are, of necessity, limits beyond which legislation cannot rightfully go. While every possible presumption is to be indulged in favor of the validity of a statute, *the courts must obey the Constitution rather than the lawmaking department of the government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed.*

Ten years later, and Idaho now gone from a territory to statehood, Justice Quarles wrote in a similar vein for this Court in a case where the prevailing appellants were represented by W.E. Borah, A.A. Fraser, and Hawley & Puckett, with the State of Idaho Attorney General arguing against the contention that the legislature had not complied with constitutional requirements in passing a certain act:

Upon this question there is some conflict of authority, but the great weight of authority and the soundest reasoning support the rule that the court not only may, but it is the imperative duty of the court, when this issue is before it, to look to the journals of the legislature, and see if, in passing the statute in question, the legislature have proceeded in the manner provided by the constitution. By the terms of said section of the constitution, *supra,* six things must be done in the passage of a law, to wit: (1) The introduction of the proposed law by bill, necessarily in writing; (2) the printing of the bill, with the amendments thereto; (3) the reading of the bill on three several days, in each House, previous to a final vote thereon; (4) the reading of the bill on its final passage, section by section; (5) a vote on the final passage, by yeas and nays: (6) the concurrence of a majority of the members present. These provisions are mandatory, and it is the imperative duty of the legislature to obey them. As we said in the case of *Dunbar v. Board of Commissioners* (decided at

the present term), ante, [5 Idaho] p. 407, 49 Pac. 409, *the duty of supporting the constitution of the state is imposed upon all public officers by the solemn obligations of the official oath, which obligations cannot be discharged by disobeying, ignoring, and setting at naught the plain provisions of the constitution, but only by obedience thereto.* In construing said section of the constitution, it is necessary to inquire into the extent of the application of the *proviso* which we find therein, viz.: "In case of urgency, two-thirds of the House where such bill may be pending may upon a vote of the yeas and nays dispense with this provision." A careful reading of the section shows that that part of the section which precedes the *proviso* consists of three separate clauses disjunctively stated. The first clause relates to the introduction of the bill, the second to the printing of the bill, the third to the reading on three several days. We are of the opinion, from the context, from the conditions which the framers of the constitution thought might arise, and from the apparent object which they had in view, that said *proviso* applies, and was only intended to apply, to the last clause preceding the *proviso.* It was not intended to authorize the legislature to dispense with the introduction of the proposed law by bill, nor was it intended to authorize the legislature to dispense with printing the bill. The framers of the constitution evidently intended by said provision to put it in the hands of the legislature, in case of necessity to act promptly, to pass a bill in one, instead of not less than six, days, and we can imagine a case where such urgency would exist. For instance, an insurrection should take place, and in order to quell it an appropriation should be promptly made, or the ˙executive should be given some power not then given by existing law, or it should be necessary to forthwith enlarge the militia. The object of requiring the printing and three several readings on separate days is a good one. It was to insure the rights and interests of the people against hasty and inconsiderate legislation. *Cohn v. Kingsley,* 5 Idaho 416, 421–22, 49 P. 985, 990–91 (1897).

The mere declaration by the Senate that "we concur in the House amendments" does not answer the requirements of the constitution.

The plaintiff, in preparing his case procured a transcript of the journals of both Houses, certified by the Secretary of State to be full and correct. This is the correct practice, and we commend it. *Id.* at 428, 49 P. at 997.

and additionally said on rehearing:

It is a matter of regret that the attorney general of the state should ridicule any of the provisions of the constitution, or speak of them as "insignificant," or use this language, which we find in the petition for rehearing: "We admit that the constitution of the state is surrounded with a halo of sanctity and solemnity, a great part of which is fictitious." The constitution requires certain things to be done in connection with the passage of any and all laws. It is true that the doing of these things is a matter of procedure. But by what right shall anyone be permitted to say that any of the things required by the constitution to be done are "insignificant," and may therefore be omitted? Has anyone more right to say that one of the things required by the constitution is insignificant and may be omitted than he has to say that any other thing required is insignificant and may therefore be omitted? If the right to ignore one provision exists the right to ignore all exists. If the court must wink at one violation of the constitution, it must wink at other violations of it. If the court must approve one violation of the constitution, it must, to be consistent, approve other violations of it. We must be subject to the constitution, or else subject to the whims of those individuals who treat the sanctity of the constitution as fictitious and its provisions as insignificant. *We cannot serve both God and Mammon. We must travel either the one road or the other. We think that*

*safety and security demand that we stick to the letter and spirit of the constitution, that we obey all of its mandates, until the people, the source of all power, who made it, change its provisions. Let us obey the constitution in all of its requirements, and treat all of its provisions as imporatnt.*

. . . .

. . . "But when the legislative power of a state is to be exercised by a department composed of two branches, or, as in most of the American states, of three branches, and these branches have their several duties marked out and prescribed by the law to which they owe their origin, and which provides for the exercise of their powers in certain mode and under certain forms, there are other questions to arise than those of the mere intent of the law-makers, and sometimes forms become of the least importance. For in such case *not only is it important that the will of the law-makers be clearly expressed, but it is also essential that it be expressed in due form of law, since nothing becomes law simply and solely because men who possess the legislative power will that it shall be, unless they express their determination to that effect in the mode pointed out by the instrument [the constitution] which invests them with the power,* and under all the forms which that instrument has rendered essential." [Quoting Judge Cooley, *Constitutional Limitations,* 5th ed., p. 156.] . . .

The persistent contention of the respondent that the court should not go back of the enrolled bill to the legislative journals to see if the act in question was passed in the mode required by the constitution in face of the fact that this court has repeatedly held that it may do so, is ill-advised and not worthy of consideration. *To hold in accordance with this contention of respondent would make the provisions of the constitution merely directory and subject to the whims of either House of the legisla-*

*ture, contrary to the express will of the people. Id.* at 431–434, 49 P. at 1000 (emphasis added).[3]

Fifteen years after, with Justice Ailshie writing, the Court in *Swain v. Fritchman,* 21 Idaho 783, 792, 125 P. 319 (1912), said of *Cohn:*

[W]e would not be inclined at this time to depart from the general rule there enunciated that the court may look to the journal. It would certainly be a remarkable and appalling situation if in the rush, hurry and turmoil of the closing hours of a legislative session a purported bill could be engrossed, certified and filed with the secretary of state and become a law which in fact had never passed the legislature nor been considered by it, and the journals clearly established that fact, and yet there should be no remedy whereby the fraud or mistake could be reached and the purported act could be prevented from going into force and operation as a law. If courts cannot go behind the enrolled bill, this would be the exact situation, *and yet the case supposed has actually occurred in this state. A bill was enrolled, certified and filed with the secretary of state as a valid act of the legislature where the legislative journals showed affirmatively that the bill had been defeated instead of passed.* (Emphasis added.)

It is abundantly clear that Judge Newhouse was correct in understanding that the courts in these United States, including Idaho, do have the power *and the obligation* to determine if any of the three coordinate branches of government act within their respective constitutional limitations, *and* that the people can exercise the final word over the legislature.

## II.

That Judge Newhouse was eminently correct in his views is readily ascertainable by giving proper regard to the mother

---

**3.** The words "express" and "expressed" have been doubly emphasized so that the reader may retain their importance when we later turn to the Washington Constitution. *Infra,* p. 1142.

tongue (our Idaho Constitution being written in the English language), and by approaching the Constitution in an orderly manner. The majority opinion by commencing its review in Article 2 has managed to avoid that which is by far the most significant provision in the Constitution, and is naturally found in the very *First* Article entitled "DECLARATION OF RIGHTS." Immediately after section 1 (which declares that we all are by nature free and equal and possessed of certain inalienable personal and property rights), follows section 2, which in full is:

> Art. 1, § 2. **Political power inherent in the people.**—All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform or abolish the same whenever they may deem it necessary; and no special privileges or immunities shall ever be granted that may not be altered, revoked, or repealed by the legislature.

Our concern today is with the first full sentence: "All political power is inherent in the people." Only by having this constitutional precept well in mind, that is to say, observed and comprehended, can a proper consideration be accorded to these other provisions of the Constitution which are today our concern. Justice Morgan in his *Johnson v. Diefendorf*[4] opinion did not fail to give recognition to the inherent vesting of all political power in the people when he wrote that:

> The right to approve or reject a law which is in full force and effect is not beyond *the political powers of the people* of Idaho, as specified in and safeguarded by sec. 2, art. 1 of *their* constitution, nor is it inconsistent with the proper exercise of these powers that they put, and continue, emergency laws in effect pending a referendum vote thereon,

as they have, by sec. 22, art. 3 thereof, *permitted* the legislature to provide for." *Johnson, supra,* 56 Idaho at 637–38, 57 P.2d at 1085–86 (emphasis added).

The words emphasized by italics are not so emphasized in the original, nor did they need to be. Without doubt, all of the justices of *that* time were well aware of art. 1, § 2. Justice Morgan succinctly pointed out that it was the *people,* in the exercise of *their* political power, who in turn authorized and permitted the legislature to declare emergencies in the exercise of the political power which the *people* had conferred upon the legislative department of the government—which government the *people* of Idaho created by their Constitution.[5, 6]

The crux of Justice Morgan's opinion in *Johnson* was hinged upon the proposition that "It was *stipulated* at the trial, in substance, *that an emergency actually existed* for the enactment of this law," (emphasis added) and, writing for the Court, he went on to say, which was the primary holding in the case: "The contention that because the act is an emergency measure it is not subject to referendum cannot be sustained." *Id.* at 638, 57 P.2d at 1086. The trial judge had concluded otherwise, i.e., that it was not subject to a referendum vote, which the Court held erroneous. The importance of the opinion is two-fold. It emphasized, if any emphasis was necessary, "The *absolute right of the people* of Idaho to govern themselves, and to alter, reform or abolish their government, is recognized in the constitution and is expressed in art. 1, sec. 2...." *Id.* at 634, 57 P.2d at 1082. It also held, because of the stipulation to the actual existence of an emergency, that a referendum petition "does not apply to, nor postpone the effective date of, emergency acts." Justice Holden was the

---

4. *Johnson v. Diefendorf,* 56 Idaho 620, 57 P.2d 1068 (1936).

5. The Preamble to the Idaho Constitution reads: "*We, the people* of the state of Idaho, grateful to Almighty God for our freedom, to secure its blessings and promote our common welfare *do establish this Constitution.*"

6. Article 2 provides that: "The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial; ...."

only other member of the Court joining that opinion.

Justice Budge, writing separately, did agree separately that the trial court had erred in ruling that the act in question was not subject to a referendum. He also agreed that the filing of the referendum petitions did not suspend the law there in question. *Id.* at 639, 57 P.2d at 1087. It was, then, a three-vote holding that the filing of the referendum petition did not abate the effective date of an emergency act, *where it was stipulated that an emergency actually existed.*[7]

Two years after *Johnson v. Diefendorf,* Justice Ailshie's opinion in *Fisher v. Masters,* 59 Idaho 366, 83 P.2d 212 (1938), was joined by all four of the justices who had split in the *Johnson* case. That case, while it has no direct bearing on today's issue, reflects the respect with which Justice Ailshie was regarded by his colleagues. As applicable to this case, it showed an awareness of all of those justices to the meaning of *"political power"* as used in the Idaho Constitution. That statement of meaning was in turn utilized by a unanimous Iowa Supreme Court in *Iowa v. Civic Action Committee,* 238 Iowa 851, 28 N.W.2d 467 (1947):

> "Political" is a word of broad meaning. Webster's New International Dictionary, Second Edition, defines it as "1. Of or pertaining to * * * the conduct of government, * * *; of or pertaining to, or incidental to, the exercise of the functions vested in those charged with the conduct of government; relating to the management of affairs of state; as *political* theories. * * *

> "3. Of or pertaining to the exercise of the rights and privileges or the influence by which the individuals of a state seek to determine or control its public policy; having to do with the organization or action of individuals, parties, or interests that seek to control the appointment or action of those who manage the affairs of a state; * * *."

One of the most widely used definitions of "political" appears in 49 C.J. 1073, taken from Bouvier: "Pertaining to policy or the administration of government."

*Fisher v. Masters,* 59 Idaho 366, 83 P.2d 212, 217, involves the validity of a statute for nonpartisan election of judges. The opinion explains the meaning of "political" as there used by saying it "has no reference to partisanship or political parties but rather to the control, management and operation of government. 'Belonging to the science of government; treating of polity or politics; as *political* principles. Having an organized system of government; administering a polity; as a fully developed *political* community.' (Funk & Wagnalls New Stand. Diction.) 'Relating to the management of the affairs of state; as political theories.' (Webster's New Internatl. Diction.)." *Id.* at 470 (emphasis original).

This meaning in turn became that used in Black's Law Dictionary, 5th ed., p. 1042. As will subsequently appear, it is important to keep well in mind what our Constitution means where it declares "all political power is inherent in the people."[8] It is the inher-

---

7. Unfortunately, Justice Ailshie, without doubt Idaho's most outstanding and distinguished constitutional authority, whose time on this Court commenced within thirteen years after the constitutional convention, did not sit with the Court. Had he sat, a reading of his many scholarly opinions on similar controversies is highly persuasive that he would have sided with Justice Givens, whose views go unmentioned in the majority opinion, which would have made it extremely likely that Justice Ailshie and Justice Givens together would have commanded a majority vote, if not a unanimous vote.

8. Only nine years after statehood Justice Ailshie authored the Court's opinion in *Toncray v. Budge,* 14 Idaho 621, 95 P. 26 (1908), which is a veritable treatise on the doctrine of separation of state and church. Although that issue is not our concern today, it was that opinion which brought to a conclusion the antipathy of a large number of people in Idaho toward the Mormon church because of its earlier belief in polygamy. Art. 1, § 4, as written and adopted still provides:

     **Guaranty of religious liberty.**—The exercise and enjoyment of religious faith and worship shall forever be guaranteed; and no person shall be denied any civil or political right,

ent power to actively participate in the legislative department of the government. Not in the executive department, not in the judicial department, but in, and only in, the legislative department.

While in *Johnson v. Diefendorf* we are deprived of the views of Justice Ailshie, we do have the views of Justice Givens, which are totally ignored by the defendants, Leroy, et al., and which are also given no mention in the majority opinion. Writing separately, he concurred in part and dissented in part. In his view of the constitutional language involved, he concluded that "The statute in question ... is in abeyance until the decision by the people in the referendum vote...." *Johnson, supra,* 56 Idaho at 645, 57 P.2d at 1093. This was no mere *ipse dixit,* but based on his acceptance of the language in the Constitution, which he did not see in any way conflicted with I.C. § 34–1803 (then S.L.1933, ch. 210, sec. 3, p. 431).

### III.

If today's majority were to strive for a proper resolution, it would not wholly ignore art. 1, § 2, nor would it fail to give consideration to *both* the initiative and the referendum, which rights are *specifically* reserved to the people in *their* Constitution, art. 3, § 1. Not only would the Constitution, as written, be given a proper interpretation, but it would be easily and quickly drawn.

All political power is reserved in the people. Idaho Const., art. 1, § 2. That is the first and foremost principle of the Constitution, a general principle which applies to the entire Constitution. The Third Article of the Constitution, dealing with the powers and prerogatives of the legislature, provides that it will be the legislature—not the executive department, and not the judicial department—which shall ordinarily exercise that political power on behalf of the people. To that end it is the legislature to which is given the sole power to enact the laws by which the people will govern themselves and allow themselves to be governed. **BUT,** the people at all times have reserved to themselves that same political power to the extent that the people may, entirely independent of the legislature, also enact laws. This is the Initiative. The use of the initiative is slow and cumbersome. It is an exercise of people political power at the polls—specifically biennial general elections. Such elections are held only in November of even-numbered years. Obviously, if there were urgent and actual need for certain remedial laws occasioned by some disaster, insurrection, riot, or other unusual occurrence, it would not be rational to await first the obtaining, and then the filing and certification of the requisite number of signatures, and then the advent of a general election at which the people register their individual votes pro and con the proposed measure. *That* could be an intolerable state of affairs. If the emergency arose just after a general election,

privilege, or capacity on account of his religious opinions; but the liberty of conscience hereby secured shall not be construed to dispense with oaths or affirmations, or excuse acts of licentiousness or justify polygamous or other pernicious practices, inconsistent with morality or the peace or safety of the state; nor to permit any person, organization, or association to directly or indirectly aid or abet, counsel or advise any person to commit the crime of bigamy or polygamy, or any other crime. No person shall be required to attend or support any ministry or place of worship, religious sect or denomination, or pay tithes against his consent; nor shall any preference be given by law to any religious denomination or mode of worship. Bigamy and polygamy are forever prohibited in the

state, and the legislature shall provide by law for the punishment of such crimes.

*See also* Idaho Constitutional Convention, pp. 143, 184, 382, 471, 930, 943, 717, 727, 961, 1992, 1996–97, and 1205 (1889).

In *Toncray, supra,* Justice Ailshie, *again for a unanimous court, wrote:*

It therefore clearly appears that the convention itself was guarding against *acts* and *practices* and *teachings* and not against *beliefs.* There was no objection at that time, and can be no constitutional one now, to a man believing that the wife to whom he is married in this life will be his wife in the hereafter, and there can be no objection to his marrying her for both "time and eternity"; .... *Toncray, supra,* at 654, 95 P. at 59.

the people themselves, acting with all due haste within the framework as presently provided, would be unable to directly enact the needed laws for almost 24 months. No one should have any trouble in comprehending that use of the initiative in situations of emergency is not realistic.

On the other hand, the legislature now holds annual sessions. Even before it turned to annual sessions, in the off (even numbered) years, the legislature was (as it is now) subject to being called into extraordinary or special sessions. Anyone of reason will readily concede that when there is actually an emergency in state affairs the only course to be followed is that the legislature go into action.

For the same reason, when genuine emergency situations actually do arise, the legislature can more expediently use the political power constitutionally vested in it to provide these laws which are necessary. It necessarily would appear to follow that the legislature is vested with the power to set the effective date of its emergency legislation and that its emergency laws, perhaps, should not be abated until the people have used their right of referendum to go to the polls—many months down the road—to approve of or reject those emergency laws. In that respect I tend to not be persuaded by the views of Justice Givens, although there is much logic in his opinion which brought him to this conclusion:

> Starting with Justice Morgan's correct premise in holding that section 1, article 3, of the Constitution applies to all legislative acts, general as well as emergency, leads, it seems to me, to the conclusion that the referendum legislation, chapter 210, 1933 Session Laws, must apply to all legislative acts, general or emergency. *Johnson v. Diefendorf, supra,* at 642, 57 P.2d at 1090.

Justice Givens stated his reasoning:

> There is no conflict between the statutes, or between the Constitution and the stat-

utes, but to say that chapter 210, *supra,* does not apply to emergency laws is reading into it an exception not put there by the legislature. Furthermore, section 1 of article 3, *supra,* provides that the legislature is to provide the "conditions" and "manner" of the exercise of the referendum.... This word would have been therefore sufficient to authorize the way in which the law should be referred and how the election should be conducted....

It seems to me *the proper legal and constitutional course is if section 3 of chapter 210, 1933 Session Laws, should be amended it be by the legislature rather than by judicial construction,* and *any act of the legislature* until repealed, amended or modified *is as binding on future legislators as any other group of citizens.* The fatal inconsistency in the other construction contended for is that by such construction the referendum as to emergency laws is as emasculated as if section 1, article 3 of the Constitution were held to not apply to emergency laws at all, and ignores this part of section 3, chapter 210, *supra:*

> ".... any measure so referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise." *Id.* at 642–43, 57 P.2d at 1090–91 (emphasis added).

Completely overlooked by the majority is the singular fact that by the *Johnson* case the legislature was made well aware that the Court's membership was troubled by the legislature's (obviously) inadvertence in not realizing the time lag which would ensue by putting off a referendum until the next general election. Since that time the legislature has convened 33 times, and is now in its 34th session, without correcting the legislation to which its attention was acutely directed.[9] This is what Justice Givens was suggesting. Mindful of his sworn obligation to uphold the Constitution as

---

9. If the legislature's inertia continues, the people in the exercise of their political power are clearly entitled to initiate an act of their own.

written, he voted accordingly. The weight of case law from other jurisdictions, most of it since written, supports his view.

## IV.

The main theme of the majority opinion is that an unsubstantiated declaration of an emergency has been likened unto a magician's wand entrusted to the legislature. The Court in *Johnson* made no such pretense. There the existence of an actual emergency was stipulated to by the parties. The Court reserved for another day to determine the question where an actual emergency was not an agreed fact:

> Whether it is for the legislature or the court to say, finally, as to the existence of an emergency within the meaning of the constitution is not before us. *Johnson, supra,* at 638, 57 P.2d at 1086.

The Court there was not ducking the issue, and it was not saying that it would duck the issue when it did arise. That was not a pussy-footed Court. What it was saying was that when the legislature declared an emergency *by delineating its reasons therefor,* then it would decide whether the Court would or would not claim the right to superimpose its own conclusions *on the existing facts as outlined by the legislature.* Such is what the Supreme Court often does in reviewing decisions of lower courts. Here, where the legislature wholly failed to set forth its facts, that issue, as in *Johnson,* is not before us. The positions taken by all four of the justices who participated in that case were far superior in quality and integrity to what this 1986 Court does this date.

A review of cases dealing with emergency declarations shows that the general principles requiring judicial review apply specifically to cases involving emergency clauses.

The Supreme Court of Michigan, in an extremely similar case, had occasion to address the specific proposition proposed by defendants' attorneys.

> This constitutional provision relates only to the passage of certain acts by the Legislature and as to when they take effect. When passed, all legislative acts are beyond its power and control.... In our opinion this proposition is supported by the overwhelming weight of the authorities.
>
> ....
>
> *We find in the instant case that this action taken by the Legislature has become the subject of a legal controversy, wherein the question of individual rights and constitutional power is involved, which question must be finally determined by the courts.* Cooley's Const. Limitations, supra; Same, pp. 77, 78. The power delegated to the Legislature must be found in the terms of this new constitutional provision, construed in connection with the intent of the people in incorporating such a provision in this Constitution. *Attorney General ex rel. Barbour v. Lindsay,* 178 Mich. 524, 145 N.W. 98, 100 (1914) (emphasis added).

*See also, Stein v. Morrison,* 9 Idaho 426, 75 P. 246 (1904) (holding that after a bill is passed, its legal effect is a judicial question).

In the *Barbour* case the Michigan Supreme Court rejected the provision making certain legislation immediately effective and held that the act took effect at the normal times, as provided in the constitution. The Michigan Court reached this result despite contentions that the legislature was the sole judge of when legislation would become effective. Certainly the rationale of the Michigan Supreme Court is applicable in this instance.

Defendants' contentions that the judicial branch would be interfering within the authority of the legislative branch ignores a fundamental aspect of legislative power in Idaho. In this state, the legislature shares its lawmaking power with the people. As the Washington Supreme Court has noted:

> The whole error in the reasoning of the respondents and the cases upon which they rely is based upon the fundamental error that this inquiry involves a controversy of opinion between co-ordinate branches of the government. If the equation could be so stated, we might

follow them. It cannot be so stated. There is another factor not occurring under the old order, where we took account of the executive, the representative body (the Legislature), and the courts. *There is now a fourth element: the people, reserving the right to assert its will over the legislative department of the government.* *State ex rel. Brislawn v. Meath,* 84 Wash. 302, 147 P. 16 (1915) (emphasis added).

Many other courts have had occasion to address similar assertions by counsel to the effect that the separation of powers doctrine precludes any review of the legislative declaration of emergency. The total lack of logic for the contrary proposition is illustrated in the following cases.

The said legislative declaration has no greater effect, and is no more binding upon the court, than if the Legislature had declared that a certain measure is or is not constitutional. In such contingency that question would still remain for the courts to determine. The question before us is simply one of construction or interpretation of an act of the Legislature and of a provision of the Constitution, and that is a judicial question. *McClure v. Nye,* 22 Cal.App. 248, 133 P. 1145, 1147 (1913).

*Now there is no more reason for saying that a bill is an emergent measure, when upon its face it is not, and from the very nature of its subject matter cannot be, just because the Legislature has said it is so, than there is for declaring a law to be unconstitutional when it has been passed by the Legislature* with the Constitution and its limitations lying open before it. The sense and discretion of the Legislature, as well as its power to discriminate between an act falling clearly without and one falling clearly within the Constitution, should, if we are consistent, be given the same weight as a declaration that an act is emergent, but few courts have so held since *Marbury v. Madison,* .1 [U.S.] Cranch, 187, 2 L.Ed. 60, although their inconsistencies have long been apparent to the lay mind. *State ex rel. Brislawn v. Meath,* 84 Wash. 302, 147 P. 11, 13 (1915) (emphasis added).

The declaration that the act is necessary for the immediate preservation of the public peace and safety has no more binding force than would the declaration in an act that "this act is constitutional," or "this is a general and not a local or special act." *State ex rel. Goodman v. Stewart,* 57 Mont. 144, 187 P. 641, 648 (1920).

The Idaho Supreme Court has come to a similar conclusion when faced with a bill passed by the Idaho Legislature which contained a clause which stated, in effect, that the law could not be construed to violate the Idaho constitutional provisions restricting the indebtedness of municipalities.

Neither can legislature bind the courts by its declaration that the act shall not be construed to be in violation of certain provisions of the constitution. The limitations of the constitution are binding upon the legislature, and cannot be nullified or avoided by the simple device of declaring them inapplicable. *Village of Moyie Springs Idaho v. Aurora Mfg. Co.,* 82 Idaho 337, 348, 353 P.2d 767 (1960).

The cases cited in this section and other parts of this opinion establish the rules of law applicable to this fact situation. The courts are not to indiscriminately interfere within the spheres of authority of the other branches of government. By the same logic, the legislature cannot exceed its powers. *The courts are obliged by our system of government to be the arbiter in the fact of allegations that one branch of government is exceeding its authority.* To limit the courts, as defendants contend, would be to eliminate a primary reason for the existence of the courts.

The defendants' arguments on the reviewability of emergency clauses are relatively simple. Defendants contend that there can be no review of emergency declarations which provide for the immediate effectiveness of legislative enactments. Defendants submit that this is true wheth-

er the declaration of emergency deprives the people of their right to a referendum or not. In support of this proposition, defendants cite language from the courts of Oregon, Colorado, and Oklahoma and include courts from six other states in a string citation. In a highly commendable manner, the attorney general in his defense of the defendants Leroy, et al., has candidly brought our attention to what they call a "minority view," which provides for a judicial review of declarations of emergency.

It would be less than candid to represent to the Court that there is not a minority view followed in some states which allows for judicial review of legislative declarations of emergencies. For example, California permits some limited judicial scrutiny of legislation rendered immediately effective through a declaration of urgency by that state's general assembly. Article 4, § 1, of the California constitution provides in part:

The second power reserved to the people shall be known as the referendum. No act passed by the Legislature shall go into effect until 90 days after the final adjournment of the session of the Legislature which passed such act, except acts calling elections ... and urgency measures necessary for the immediate preservation of the public peace, health or safety passed by a two-thirds vote of all the members elected to each house. Whenever it is deemed necessary for the immediate preservation of the public peace, health or safety that a law shall go into immediate effect, a statement of the facts constituting such necessity shall be set forth in one section of the act, which section shall be passed upon only upon a yeah and nay vote, upon a separate roll call thereon ... any law so passed by the Legislature and declared to be an emergency measure shall go into immediate effect.

The above-quoted provision of the California constitution differs markedly from the language of Idaho's art. 3, § 22. The California charter specifically requires that the legislature include a statement of the facts constituting the perceived emergency. Our constitution has no similar procedure and may be distinguished on that basis. However, there is a more fundamental difference; this critical distinction is articulated in the following quote from the case of *Davis v. Los Angeles County*, 79 P.2d 1102 (Cal.App. 1938):

But if the only reasonable conclusion to be reached from the facts which appear on the face of the enactment is that the measure is not immediately necessary for the preservation of the public peace, health or safety, it becomes the duty of the courts to hold that the measure did not become effective until after the expiration of the period of 90 days as provided in the constitution.... *Although the right of the legislature to pass urgency measures must be upheld in proper cases, it is nevertheless the plain duty of the courts to sustain the referendum provisions of the constitution* when in fact no necessity exists for the immediate operation of the legislation under review. (emphasis supplied)

79 P.2d at 1104.

It is clear from the above quote that the motivating factor which led the California courts to conclude that the judiciary should review legislative declarations of emergency was the adverse impact of such declarations on the right of referendum. In California, an emergency label attached to a bill defeats the right to refer the issue to the voters. Because an emergency declaration cancels a constitutional right conferred upon California's citizens, its courts have concluded that judicial review of such a determination is necessary to protect the integrity of the referendum process.

A similar rule has been adopted in the state of Washington. Article II, § 1(b), of the Washington Constitution states:

The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law or any

part thereof passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government, and its existing public institutions, either by petitions signed by the required percentage of the legal voters, or by the legislature as other bills are enacted.

In Washington, it is clear that the legislature's declaration of emergency cuts off the right of referendum which is otherwise reserved to the people. See, *State v. Coe*, [42 Wash.2d 569] 257 P.2d 1990 [190] (Wash.1953). Like its counterpart in California, the Washington Supreme Court has held that limited judicial review of legislative declarations of emergency is necessary to preserve the referendum:

> The judicial branch of the government owes a duty to the people, in order to protect their right of referendum, which they took upon themselves when they passed the seventh amendment, to scrutinize closely every act containing an emergency clause coming before it for its consideration, and to determine whether or not, as a matter of fact, an emergency actually did exist in each given case. (emphasis supplied)

*State v. Coe*, supra, 257 P.2d at 202 (Schwellenbach, J., concurring).

> Montana's Constitution, in art. 5, § 1, provides: The people reserve to themselves power ... to approve or reject at the polls, any act of the legislative assembly, except as to laws necessary for the immediate preservation of the public peace, health, or safety.

In finding that an emergency declaration abolishes the right of referendum, the Montana Supreme Court has held:

> It will be noted that this provision vests no power in the Legislature, but merely excepts from the reserved power of the people those laws which are, in fact, necessary for the immediate preservation of the public peace, health, and safety, and the question as to whether a particular law falls within the reservation or the exception is a question of fact to be determined as are other facts, that is, by the court on a showing made....

*State v. State Board of Education,* [97 Mont. 121] 33 P.2d 515 [516], 519 (Mont. 1934).

Again, it is the adverse impact of an emergency declaration on the right to referendum which has led the Montana court to conclude it has an obligation to review a declaration of urgency.

Other states have likewise concluded that judicial review of a legislative finding of emergency is needed because such a finding terminates the right to referendum. The courts of these states have concluded that a legislative attempt to abolish the referendum through an emergency clause merits scrutiny. See, *People v. Stambosba* [Stambosva], [210 Mich. 436] 178 N.W. 226 (Mich.1920); *Molesworth v. Secretary of Commonwealth,* [347 Mass. 47] 196 N.E.2d 312 (Sup.Jud.Ct.Mass.1964); *Morris v. Goss,* [147 Me. 89] 83 Atlantic 2d 556 (Me.1951). Even if the reasoning of these decisions is found to be persuasive, its adoption would not mandate court review of emergency clauses attached to legislation in Idaho. Appellant's Brief, filed Oct. 11, 1985, pp. 20–24.

A close analysis of defendants' argument on this subject, as well as the citations purportedly supporting that argument, will show that the argument is neither well-founded nor well supported.

The State of Oregon was one of the first states to adopt, as a constitutional amendment, the right of initiative and referendum. Oregon passed the initiative and referendum amendment in 1901, and it was approved by the voters of Oregon in 1902.

The seminal case cited by defendants' counsel in support of the doctrine of nonreview of emergency declarations is *Kadderly v. City of Portland,* 44 Or. 118, 74 P. 710 (1903). This case is the original and leading case for other states cited by defendants as standing for the theory of no

judicial review of emergency declarations. Almost all of the other states cited by defendants' counsel have as their basis for nonreview, a citation to the *Kadderly* case.

Every case concerning referendum can theoretically be distinguished because *Idaho's referendum statute is unique.* The *Kadderly* case was decided by the Oregon Supreme Court in 1903, prior to the adoption of the referendum amendment in Idaho.

The Texas case cited in appellants' brief, *Artcarved Class Rings, Inc. v. City of Austin,* 551 S.W.2d 788 (Tex.App.1977), specifically cites *Kadderly* as providing the basis for the Texas Court of Appeals to anticipate no judicial review. 551 S.W.2d at 790. Similarly, the Oklahoma Supreme Court, in *Oklahoma City v. Shields,* 22 Okl. 265, 100 P. 559 (1908), relies on *Kadderly* for its ruling. 100 P. at 574–76. The Colorado case cited is to the same result. *Van Kleeck v. Ramer,* 62 Colo. 4, 156 P. 1108, 1110. The same is true of the Virginia Court ruling in *City of Roanoke v. Elliott,* 123 Va. 393, 96 S.E. 819, 822. It is also important to note that no constitutional issues were raised in the Virginia case, as those challenging the emergency clause did not contend they were deprived of any constitutional right by the emergency declaration. 96 S.E. at 824.

Continuing this line of unquestioning citation to the *Kadderly* precedent, the Supreme Court of Ohio, in *State ex rel. Schorr v. Kennedy,* 132 Ohio 510, 9 N.E.2d 278 (1937), cites to the *Van Kleeck* case, which relied upon the Oregon precedent.

The Arizona case, *City of Phoenix v. Landerman Mills Realty Co.,* 71 Ariz. 382, 227 P.2d 1011 (1951), merely concludes that review is not available without giving a reason. The Indiana case cited by defendants, *Gentile v. State,* 29 Indiana 409 (1868), does not address the issue of review, but does, in dicta, contain a citation to an obscure Indiana case which may or may not stand for the proposition asserted.

Thus, because defendants' arguments must sink or fall with the 1903 decision of the Oregon Supreme Court, an indepth analysis of that decision and a review of its subsequent treatment is warranted.

*Kadderly* involved an amendment to the City Charter of Portland concerning, generally, taxation and local improvement districts within the city. The legislature, as part of the Portland Charter, stated that a charter "was necessary for the preservation of the public peace, health, and safety," 74 P. at 720, thus exempting the law from referendum. The legislative enactment also included detailed statements of facts supporting this declaration. Under the particular referendum amendment adopted in Oregon, laws "necessary for the immediate preservation of the public peace, health, or safety are excepted from the referendum." [10] *Id.* The Oregon Legislature also attached an emergency clause to the Portland Charter, putting the charter into immediate effect.

In reviewing whether the right of referendum could be abolished by classifying a law as necessary for the immediate preservation of the public peace, health, or safety and implementing it through an emergency clause, the Oregon Court framed the issue as follows: "the vital question is, what tribunal is to determine whether a law does or does not fall under this classification? Are the judgment and findings of the legislative assembly conclusive, or are they subject to review by the courts?" *Id.* The Court then reviewed the Oregon referendum amendment and pointed out that laws found to be necessary for the immediate preservation of the public peace, health, or safety are not subject to the referendum, concluding that: "as to such laws, the amendment of 1902 does not in any way abridge or restrict the power of the legislature, which, by the insertion of a proper emergency clause, may unquestionably cause them to go into effect." *Id.* at 720–721. The Oregon Court then conclud-

---

**10.** The Oregon Constitution exempts certain laws from the referendum provisions of that constitution. *Any act* or measure of the Idaho Legislature is subject to the referendum. Idaho Const. art. 3, § 1.

ed that such an emergency declaration, or findings of necessity cannot be reviewed.

> It has always been the rule, and is now everywhere understood, that the judgment of the legislative and executive departments as to the wisdom, expediency, or necessity of any given law is conclusive on the courts, and cannot be reviewed or called in question by them.... The powers of the courts do not extend to the mere question of expediency or necessity. *Id.* at 721.

The Oregon Supreme Court provided the following answer concerning the role of the courts under such a theory of separation of powers:

> But, it is argued, what remedy will the people have if the Legislature, either intentionally or through mistake, declares falsely or erroneously that a given law is necessary for the purposes stated? The obvious answer is that the power has been vested in that body, and its decision can no more be questioned or reviewed than the decision of the highest court in a case over which it has jurisdiction. Nor should it be supposed that the Legislature will disregard its duty, or fail to observe the mandates of the Constitution. The courts have no more right to distrust the Legislature than it has to distrust the courts. The Constitution has wisely divided the government into three separate and distinct departments, and has provided that no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in the Constitution expressly provided. Const. art. 3, § 1. It is true that power of any kind may be abused when in unworthy hands. That, however, would not be a sufficient reason for one co-ordinate branch of the government to assign for attempting to limit the power and authority of another department. If either of the departments, in the exercise of the powers vested in it, should exercise them erroneously or wrongfully, the remedy is with the people, and must be found, as said by Mr. Justice Strahan in *Biggs v. McBride, supra,* in the ballot box. *Kadderly Id.* at 721.

As appellants' citations indicate, the Oregon Courts have apparently stood by the rule laid down in *Kadderly.* Other courts have not been so inclined.

The State of Washington adopted an initiative and referendum amendment on the same day in 1912 as did Idaho, some ten years after the Oregon amendments. The Washington Supreme Court, in the case of *State ex rel. Brislawn v. Meath,* 84 Wash. 302, 147 P. 11 (1915), had the opportunity to review the *Kadderly* case in terms of a challenge to an act of the Washington Legislature which contained an emergency clause. In Washington, an emergency clause has the same effect as it does in Idaho, providing for immediate effectiveness instead of some period of time after adjournment of the session. The Washington referendum provision in the constitution was similar to the referendum provision in the Oregon Constitution, excepting laws in certain areas from being subject to referendum. As in the instant case, the Court in *Brislawn* was urged that *Kadderly* was the prevalent rule and that the Court could not inquire into the emergency declaration of the legislature. 147 P. at 12–13. The Washington Supreme Court noted that Oregon had issued the *Kadderly* decision, precluding such review. The arguments urged upon the Washington Supreme Court were identical to those espoused by defendants in this case: "that the courts are powerless to inquire into the acts or discretion of the legislature; that we are governed by the same rules and by the same considerations which have moved the courts since the establishment of our government to put no judicial restraints upon legislative discretion." 147 P. at 11–12. In analyzing the ruling from *Kadderly,* the Washington Court examined the specific referendum provisions of their constitution and, after noting that Washington's referendum provisions provided for the referral of any act except those declared to be in a certain class, they went on to point out that the *Kadderly* ruling

urged upon them was inconsistent with the plain language of the constitution.

*If specific reservation in words of the right to subject all laws to the referendum* were not enough, the preamble of the amendment makes it clear that the people intended to assert that the revised and amended clause of the Constitution permitting emergent legislation should not be a dead letter, as was section 31, which was expressly repealed. They said:

"The legislative authority of the state of Washington shall be vested in the Legislature, consisting of a senate and house of representatives, which shall be called the Legislature of the state of Washington, but the people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the Legislature, and also reserve power, at their own option, to approve or reject at the polls any act, item, section, or part of any bill, act or law passed by the Legislature." Sessions Laws 1911, p. 136. 147 P. at 13 (Emphasis added).

The Washington Supreme Court then addressed the contention, similar to defendants' in this case, that despite the constitutional right to a referendum, there could be no judicial review of emergency declarations. The Washington Court noted the effect such a contention would have on the right to a referendum.

At the time section 31 [referendum] was written in our Constitution, it had already been declared by other courts to be a stillborn child, a voice dying in the utterance of a command, putting no restraint upon the Legislature, and being beyond the range of judicial interference. It was in legal effect and under judicial construction as barren as if no words had been written after the section number. 147 P. at 13–14.

Based upon this analysis, the Washington Supreme Court specifically rejected both the logic and the holding of the *Kadderly* decision. The Washington Supreme Court went in great detail to explain the faulty rationale of *Kadderly:*

We hesitate to match opinion with one so learned in the law as the writer of this opinion [Kadderly], but *conscience impels a different conclusion. His argument is fallacious and unsound.* Under the old form, the Legislature was acting under a free license to legislate. The people had reserved no right of review. Its act implied discretion, and courts had very properly held that one co-ordinate branch of the government will not review the discretion of another. *There was no review or appeal from an expression of that discretion, however violently it wrenched the moorings of constitutional restraint.* The declaration of an emergency was final and conclusive. But here no such declaration is final and should be given no immediate effect, unless it can be fairly said that the act is necessary to preserve the health, peace, or safety of the state or to support the government or its institutions.

  .    .    .    .    .

The reservation in the amendment is a declaration of "Thou shalt not," except it be for the safety or support of the state. Broadly stated, the police power of the state is the state's law of self-defense, in respect to both persons and property. *Carstens v. De Sellem,* [82 Wash. 643] 144 Pac. 934.

*The learned justice who wrote the opinion in the Kadderly Case is in error* when he says the obvious answer to the question, "What remedy will the people have if the Legislature, either intentionally or through mistake, declares falsely or erroneously that a given law is necessary for the purposes stated?" is "that the power has been vested in that body, and its decision can no more be questioned or reviewed than the decision of the highest court in a case over which it has jurisdiction" *Kadderly v. Portland,* supra. *On the contrary, power has been withheld, in so far as a withholding can be made by apt and certain*

*words.* It follows, then, that it is a question of power rather than of discretion. The limitation of that power must be found in the terms of the Constitution construed in connection with the intent of the people in incorporating such a provision in the Constitution, *Attorney General ex rel. Barbour v. Lindsay,* 178 Mich. 524, 145 N.W. 98. *Id.* 147 P. at 15 (Emphasis added).

Plaintiffs have cited the language of the Washington Court at great length for several reasons. It gives compelling reason and logic for rejection of the *Kadderly* view. It would certainly be a cynical deprivation if the right of referendum were declared by the Idaho Supreme Court to be the stillborn child that the right of referendum has become in Oregon. As the *Brislawn* Court said, conscience compels otherwise.

The Washington Supreme Court summarized the entire issue before this Court and noted that *Kadderly* was the seed from which other decisions precluding judicial review had sprung, stating:

We think we have sufficiently met the Kadderly Case. In doing so we have also met the other cases relied on, for they were all decided upon the authority of that case; but, if we have not, the Kadderly Case can be distinguished in that it involved an act creating a charter for the city of Portland. Cities are vested with the power to exercise the police power, and we may well say that the act fell without the exception or was so doubtful as to warrant the conclusion, if not the argument, of the court.

*Without further reviewing the cases, it is enough to say that none of them grasp the reason or philosophy of the recent change in the fundamental law. They are in step with a tune that is dead.* It is no answer to say that courts have always held to a certain rule, for, as we have shown, the present condition has not existed heretofore. The first of the adjudged cases did not note the change or rather did not count it as a change at all, and the others have followed it blind-.

ly and with the usual reverence for "authority." As Judge Dunbar said in *State ex rel. Oregon R., etc, Co. v. Railroad Co.,* 52 Wash, 17, 100 Pac. 179: "Law is a progressive science." If this be so, courts should not put themselves to the task of groping for "authority" to sustain a statute or an amendment to the Constitution when it is clearly within the power of the Legislature to pass it or of the people to adopt it. *Id.* 147 P. at 17 (Emphasis added).

The Washington Supreme Court went on to hold that the legislative declaration was reviewable, and they issued a writ, in effect, preventing the statute from taking effect. Subsequent Washington Courts have furthered and supported the *Brislawn* ruling. *Swartout v. City of Spokane,* 21 Wash.App. 665, 586 P.2d 135 (1978); *State ex rel. Humiston v. Meyers,* 61 Wash.2d 772, 380 P.2d 735 (1963); *State ex rel. Hoppe v. Meyers,* 58 Wash.2d 320, 363 P.2d 121 (1961); *State ex rel. Gray v. Martin,* 29 Wash.2d 799, 189 P.2d 637 (1948); *State ex rel. Satterthwaite v. Hinckle,* 152 Wash. 221, 277 P. 837 (1929).

The other state courts addressing the same issue have generally adopted the *Brislawn* rationale and rejected *Kadderly.* Montana adopted initiative and referendum as a part of their constitution in 1907. In the case of *State ex rel. Goodman v. Stewart,* 57 Mont. 144, 187 P. 641 (1920), the Montana Supreme Court had before it the very issue addressed by the *Kadderly* and *Brislawn* cases, and the issue before the Court in this case. The Montana Legislature had passed a law concerning primary election laws and declared an emergency providing for the immediate effectiveness of that law. A referendum petition was thereafter circulated and filed. The *Goodman* case arose when the Secretary of State filed an action to prevent the filing of the referendum petition, urging that the Montana Supreme Court adopt the rule stated in *Kadderly* and its progeny, including *Van Kleeck,* and not review any declaration of emergency but hold that it is conclusive upon the courts. After review-

ing the background of the *Kadderly* case, the Montana Supreme Court, like the Supreme Court of Washington, specifically rejected the rule of no review and criticized the Oregon Court.

*We believe the learned justice who wrote the [Kadderly] opinion based his conclusion on a false premise;* he argues that because the question is a question of fact, and the authority to determine that fact rests "somewhere," and the Constitution has not conferred it upon any tribunal, it must necessarily rest with the Legislature. If the reasoning was sound, it would apply with equal force to questions arising as to whether acts were in violation of the state Constitution, and on the passage of local and special laws on the prohibition subjects; for here also "the authority to determine it must rest somewhere," and "the Constitution does not confer it upon any tribunal." 187 P. at 643 (Emphasis added).

The Montana Court quoted with approval the criticisms and holding from the Washington Supreme Court in *Brislawn.* Similarly, the Montana Court then rejected the leading son of *Kadderly,* the *Van Kleeck* case from Colorado.

It might be suggested here, also, that the Oregon court may have been driven to an erroneous declaration of the law by the necessity for the inevitable conclusion reached. As suggested by Justice Scott [dissent in *Van Kleeck*], there were many important questions to be determined in the case; the question here involved was but incidental. No one, we take it, on reading the emergency declaration in that case, would presume to say that it did not appear that the conclusion that an immediate necessity existed was inevitable. Realizing the urgency of the necessity, and being familiar with the old rule of construction, proper in the absence of the existence of the initiative and referendum, it is possible that the learned writer of that opinion merely took the wrong lane to reach his proper destination. 187 P. at 644–645.

The Montana Supreme Court adopted the rule which is followed by the majority of

jurisdictions in the United States, and noted that "The decision of the Court of another state construing a statute thereof will not be followed by the Court of a state borrowing such statute, unless the decision appeals to it as founded on right reasoning." *Id.* at 645.

Having arrived at the conclusion that from the modern trend of the authorities on the comparatively new question, and from reason and logic, the rule we should adopt is that *the declaration by the Legislature is not final nor conclusive,* nor is to be considered merely as a contemporaneous declaration or expression of the Legislature, and that the *question must be determined by the courts as arbiters between two equally powerful bodies of the same branch of the government,* and in that determination the doubt as to whether the act in question is or is not immediately necessary for the purpose named, if any there be, shall be resolved in favor of the people, in whom the power originally vested and who have reserved the power to themselves to refer any act, except in those instances enumerated, we will seek to apply the rules laid down to the matters set forth. *Id.* at 649 (Emphasis added).

Montana continues to hold to that rule. *State ex rel. Haynes v. District Court of First Judicial District,* 106 Mont. 470, 78 P.2d 937 (1938); *State ex rel. Veeder v. State Board of Education,* 97 Mont. 121, 33 P.2d 516 (1934).

Perhaps the leading court in the country concerning the issue in this case has been the Supreme Court of Missouri. A veritable plethora of cases have come before the courts in Missouri, and applying a rule first laid down in *State ex rel. Westhues v. Sullivan,* 283 Mo. 546, 224 S.W. 327 (1920), the Missouri Courts have provided for judicial review of emergency declarations, and in many cases have invalidated those emergency clauses. *Westhues* presented the issue by an action to enjoin the Secretary of State from filing referendum petitions on a law passed by the Missouri Legislature, which law contained an emergency clause.

The *Kadderly* rule was urged upon the Missouri Supreme Court and it was rejected, with the Missouri Court citing with approval the rationale and criticisms found in *Brislawn*. The Missouri Court very clearly recognized the issue before it as whether "the Legislature can foreclose the constitutional right of referendum by simply tacking on and passing an emergency clause." *Id.* 224 S.W. at 333. The Missouri Court rejected *Kadderly*, saying: "This idea is not sound, nor does it comport with the weight of the better reasoned cases." *Id.* at 334. The Missouri Court pointed out that the referendum power, similar to that found in the Idaho Constitution, applies to "any act of the legislative assembly." *Id.* at 334. The Court noted that, had the framers of the constitutional provision wished the referendum to not apply to emergency measures, it would have been easy to so designate. However the term "any act" does not exclude emergency clauses. The Court correctly noted that adoption of the *Kadderly* rule of no review of emergency declaration would in effect make the referendum amendment "idle and nugatory." *Id.* at 335. The same effect would result in this case if the Court adopts the assertions of defendants. The Missouri Supreme Court held that the Courts must be free to review such declarations, and this Court should do the same.

One year later the Missouri Supreme Court again reaffirmed its rejection of *Kadderly* in *State ex rel. Pollock v. Becker*, 289 Mo. 660, 233 S.W. 641 (1921). As Justice Graves pointed out in his concurring opinion, *"The Kadderly Case*, 48 Or. 118, 74 P. 710, 75 P. 222, from Oregon, does not announce sound doctrine." 233 S.W. at 646. Missouri has consistently held to such opinion and has reviewed emergency declarations for their factual basis. *State ex rel. State Highway Comm. v. Thompson*, 323 Mo. 742, 19 S.W.2d 642 (1929); *State ex rel. City of Charleston v. Holman*, 355 S.W.2d 946 (Mo.1962); *Padberg v. Roos*, 404 S.W.2d 161 (Mo.1966); *Hatfield v. Meers*, 402 S.W.2d 35 (Mo.1966); *State ex rel. Tyler v. Davis*, 443 S.W.2d 625 (Mo.1969); *Osage*

*Outdoor Advertising Inc. v. State Highway Comm. of Missouri*, 687 S.W.2d 566 (Mo.App.1985).

The Supreme Court of Michigan has also definitively rejected the *Kadderly* rule and has provided that emergency clauses shall be reviewed even though they do not involve the issue of a referendum. In *Attorney General ex rel. Barbour v. Lindsay*, 178 Mich. 524, 145 N.W. 98 (1914), the Michigan Supreme Court had before it the urgings of certain officials in Michigan that the emergency declaration attached to the law providing for a charter for the city of Detroit was not subject to judicial review. They cited *Kadderly* and the cases resulting therefrom, including a case relied upon by defendants herein, *Oklahoma City v. Shields*, 22 Okla. 265, 100 P. 559 (1908). The Michigan Supreme Court rejected the rule of no review, even though the possibility of defeating the constitutional right to a referendum was not even an issue in that case, as the state of Michigan apparently did not have a referendum provision in their constitution at the time. The Michigan Court instead based its ruling upon general powers of the court to have judicial review under a separation of powers doctrine.

The Michigan holding has been approved by a great variety of courts and adhered to in Michigan. *People v. Stambosva*, 210 Mich. 436, 178 N.W. 226 (1920); *Todd v. Hull*, 288 Mich. 521, 285 N.W. 46 (1939).

The courts of the state of South Dakota have similarly had the *Kadderly* rule urged upon them in the case of an emergency clause not dealing with a referendum. In *State ex rel. Richards v. Whisman*, 36 S.D. 260, 154 N.W. 707 (1915), appeal dismissed 241 U.S. 643, 36 S.Ct. 449, 60 L.Ed. 1218 (1916), the Supreme Court of South Dakota rejected the *Kadderly* doctrine and instead adopted that espoused by the Washington Supreme Court in *Brislawn*. Such a rule has enabled the South Dakota courts to review emergency clauses in many situations, overturning such declarations when they found them to be on unsound grounds. *State ex rel. Kleppe v.*

*Steensland,* 46 S.D. 342, 192 N.W. 749 (1923); *Culhane v. Equitable Life Assurance Society of the United States,* 65 S.D. 337, 274 N.W. 315 (1937); *State ex rel. Hurd v. Blomstrom,* 72 S.D. 526, 37 N.W.2d 247 (1949); *State v. Van Loh,* 86 S.D. 22, 191 N.W.2d 294 (1971); *Gravning v. Zellmer,* 291 N.W.2d 751 (S.D.1980).

Many other state Supreme Courts have rejected the *Kadderly* doctrine urged upon this Court and have held it within the judicial power to review emergency declarations. Every other Court that has addressed a similar issue has provided that the courts are free and, in fact, required to review emergency declarations, whether they deal with the right of referendum or not. *Gentry v. Harrison,* 194 Ark. 916, 110 S.W.2d 497 (1937); *Amos v. Conkling,* 99 Fla. 206, 126 So. 283 (1930); *McIntyre v. Commonwealth,* 221 Ky. 16, 297 S.W. 931 (1927); *Graham v. Dye,* 308 Ill. 283, 139 N.E. 390 (1923); *Morris v. Goss,* 147 Me. 89, 83 A.2d 556 (1951); *Mayor and City Council of Baltimore v. Hofrichter,* 178 Md. 91, 11 A.2d 375 (1940); *Burnsville v. City of Bloomington,* 268 Minn. 84, 128 N.W.2d 97 (1964); *Sears v. Secretary of the Commonwealth,* 369 Mass. 392, 341 N.E.2d 264 (1975); *Todd v. Tierney,* 38 N.M. 15, 27 P.2d 991 (1933); *Flushing Nat'l Bank v. Mutual Assistance Corp.,* 40 N.Y.2d 731, 390 N.Y.S.2d 22, 358 N.E.2d 848 (1976); *State ex rel. Duncan v. Franklin County Conservancy Dist.,* 92 Ohio St. 215, 110 N.E. 726 (1915).

The important point is not necessarily the number of cases providing for judicial review of emergency declarations, but the constitutional rights asserted and the rationale and logic of those cases. This is especially true given the fact that Idaho's constitutional provisions are unique and this is a case of first impression.

Taking its lead from the attorney general's brief, and in an enviable emulation of a noted Australian bird, the majority, notwithstanding that the Court has been provided with an abundance of, perhaps all, available authority, has simply refused to meet the issue presented.

V.

The majority derives far more out of *Diefendorf v. Gallet,* 51 Idaho 619, 10 P.2d 307 (1932), than was put into it by Justice Leeper. At the outset the *Gallet* Court noted, as was later so in *Johnson v. Diefendorf,* the issues were presented on an agreed case, and before that Court were three general lines of inquiry. "One has to do with the power of the state to impose a tax upon net incomes. The second is concerned with the constitutional aspects of the various provisions of this particular law. The third relates to the regularity of the enactment of the law." *Gallet, supra,* 51 Idaho at 624, 10 P.2d at 312. The majority's concern today, if such it really is, has to do with the third—the regularity of the enactment of the law. The majority's "concern" is largely self-manufactured as a predicate for reading more into *Johnson* than can actually be found there. In doing so, the majority will be seen as being a wee bit loose in use of the word emergency:

> In *Gallet*[1] we found that the judiciary cannot second-guess the governor's determination that a sufficient emergency exists to justify calling an extraordinary session of the legislature. We also found that the judiciary cannot second-guess the legislature's determination that a sufficient emergency exists to justify dispensing with the constitutional requirement that before an act may be passed it must be printed and read on three separate days in each house.

Majority op., p. 1133.

Article 4, § 9 reads thusly:

> **Extra sessions of legislature.**—The governor may, on extraordinary occasions, convene the legislature by procla-

---

1. Recognizing that it is nothing but a matter of style, the majority seems a bit overreaching wherein it writes in terms of what "we" found, said, and did in *Gallet.* None of us presently holding office were yet out of grade school. It is for us today to study the old opinions, and ascertain the reasoning and logic which were the *ratio decidendi* of those earlier supreme courts.

mation, stating the purposes for which he has convened it; but when so convened it shall have no power to legislate on any subjects other than those specified in the proclamation; but may provide for the expenses of the session and other matters incidental thereto. He may also, by proclamation, convene the senate in extraordinary session for the transaction of executive business.

The *Gallet* Court itself did not enumerate the Governor's power to call a special session as any of the issues it had to decide. In the quotation above, it was simply reciting the obvious—which was that the Court was not going to go behind the *facts* upon which the Governor declared to have prompted his action. The *Gallet* Court might have drawn a better comparison to *In re Boyle*, 6 Idaho 609, 57 P. 706 (1899).

Article 3, § 15, as here pertinent, reads in part that the legislature may "in case of *urgency*," by a two-thirds vote of either house where a bill is pending dispense with the provision therein contained which reads "nor shall any bill become a law unless the same shall have been read on three several days ... previous to the final vote thereon." Urgency does not equal emergency. If the legislature has set a goal for adjournment, and that time is drawing nigh, the legislature could perceive such to make it urgent that a bill be speeded along. But that does not rise to being an emergency. It is strictly an in-house proposition which does not in any way concern either the executive department of the government or the judicial department. If the Governor does have some objection to the bill—including the manner of its enactment, presumably the veto power will be exercised. The Supreme Court similarly has rules by which it regulates the movement of its opinions in progress. Where some degree of expediency (urgency) is perceived, the Court can by agreement accelerate the process. One would like to think that this in-house procedure is not a proper concern of either of the other departments.

There is nothing in *Gallet* with which anyone disagrees. That case, however, does not in the least bolster the majority's conclusion that *Gallet* has provided a reasoning for the proposition that the legislature can simply say "emergency," without laying out for public display the facts which are seen to mount to emergency as the word is used by English-speaking people. This is *not* an in-house matter. The issue here is far broader and involves the basic and fundamental reserved power of the people themselves—both to pass laws, and to reject or approve at the polls those passed by those persons who merely *represent* the people and who are known as senators and representatives.

Today it is AFL–CIO, *et al.*, who are engaged in the constitutional peoples' right of *direct* legislation. Tomorrow it may be the farmers. One day it may be an association of college students. The question presented is not who of the people wants to exercise the right of direct legislation—it is enough that they are Idaho people. The legislature claims the ability to defeat the people by declaring an emergency without one specified fact pointing to an emergency. The Constitution provides that the right of the people cannot be so easily denied.

Nor is it of any succor to the majority to struggle along on the hope that there is a possible conflict between the legislature's constitutional power and the legislature's own statute. Not so. The controversy is between the legislature and the people which created it. The statute which provided the manner of effectuating the initiative and the referendum:

§ 34–1803. **Referendum petitions— Time for filing—When election held— Effective date of law.**—Referendum petitions with the requisite number of signatures attached shall be filed with the secretary of state not more than sixty (60) days after the final adjournment of the session of the state legislature which passed on the bill on which the referendum is demanded. All elections on measures referred to the people of the state shall be had at the biennial regular election. Any measure so referred to the

people shall take effect and become law when it is approved by a majority of the votes cast thereon, and not otherwise.

There is no occasion to discuss what would have happened had the legislature not, by act, which makes law, set up the machinery for the operation of the people's right of initiative and referendum. The fact is that it did so. The further fact is that some laws made by the legislature are by the reason of the grants of power specified in the Constitution (a great number of them—a ready-at-hand example of which is that all judicial vacancies shall be filled *as provided by law*, art. 5, § 19). But the people with their established right of initiative also have the power to repeal or change the laws—which includes changing § 34–1803. In the meanwhile, § 34–1803 is the law, and that law *of the legislature* is, as Justice Givens noted years ago, that a law which the people take to a referendum vote "shall take effect and become a law when it is approved by a majority of the votes cast thereon, *and not otherwise.*" Nothing could be more plain. Even without the last three words, that is strong language. The final clause completely shuts the door on any attempt to defeat the constitutional right of referendum. And, as pointed out earlier, many are the legislatures which have not taken any action to amend or alter it in the slightest.

The majority would have a better opinion had it been restricted to this much and no more:

[W]e hold that the legislature's determination of an emergency in an act is a policy decision exclusively within the ambit of the legislative authority, and the judiciary cannot second-guess that decision. . . . [T]he judicial branch of government must respect and defer to the legislature's exclusive policy decisions. At p. 1136.

What the people are receiving today at the hands of this Court is the ultimate of all of its *ipse dixit* decisions. Omitted from the above is an intervening sentence which reads: "In the absence of a legislative invasion of constitutionally protected rights, the judicial branch of government must respect and defer to the legislature's exclusive policy decision." At p. 1136. But there is no such absence. Indeed, there is a legislative invasion of constitutionally protected rights, and it is the rights of the people which are being trampled upon. The Court has simply made a policy decision—which is hands-off and away from offending the legislature. As it now stands, the judicial department may be seen as passively aiding and abetting the legislature's unconstitutional inroads on the political power reserved in the people.

As an incidental matter, but nevertheless apropros to the real issue before us, the 1931 Session laws readily provide the interested reader with the proclamation by which Governor C. Ben Ross called the legislature into the special session which eventually produced the *Gallet* case. No mere *ipse dixit* declaration of an extraordinary occasion, the Governor succinctly and sufficiently detailed the factual reasons which motivated him, and he also left no doubt as to the purposes for which he convened it. The Governor simply did not "proclaim" as the legislature has merely "declared."

# PROCLAMATION

WHEREAS, the failure of the regular session of the Legislature to enact tax laws, to meet the pressing demands of the State requires the convening of a special session of the State Legislature;

NOW, THEREFORE, I, C. Ben Ross, governor of the State of Idaho, by virtue of authority in me vested by this proclamation call the Legislature of the State of Idaho to meet in special session at the Capitol, at Boise City, in Ada County, Idaho on the 6th day of March, 1931 at twelve o'clock M. for the following purposes, and none other to-wit:

For the purpose of considering and enacting laws imposing taxes for raising the needful public revenues, considering and determining the form and scope of such taxation, the manner of levying the same, and the subjects of such taxation, and each and every matter necessary to a full consideration and enactment of such laws, and any and all matters affecting the public revenues and the levying and collecting of taxes for public purposes, and to consider and propose amendments to the revenue provisions of the Constitution of the State of Idaho.

The Legislature may also provide for the expenses of the session, and other matters incidental thereto.

IN WITNESS WHEREOF, I have hereto set my hand and caused the seal of the State of Idaho to be affixed by the Secretary of State this Fifth day of March, 1931.

(Signed)   C. BEN ROSS,
*Governor*

(GREAT SEAL)

Attest:

(Signed) FRED E. LUKENS,
*Secretary of State*

---

Seven years later, Governor Barzilla Clark recognized an implicit obligation to publicize the circumstances which motivated him to call a special session:

# PROCLAMATION

BECAUSE The welfare and actual existence of thousands of worthy, but needy, men, women and children, now residents in all sections of the State of Idaho, are directly and acutely threatened by lack of funds legally available for their necessary relief and assistance, and immediate action must be taken in their behalf, and for the best interests of the State of Idaho; and because the funds available for the actual maintenance of the Idaho State Penitentiary and the inmates is entirely insufficient for the biennium ending December 31, 1938, I Barzilla W. Clark, as Governor of the State of Idaho, do hereby declare that an extraordinary occasion of grave emergency now exists in the State of Idaho.

THEREFORE, I, Barzilla W. Clark, Governor of the State of Idaho, by virtue of constitutional authority vested in me, do, by this proclamation, call the Legislature of the State of Idaho to meet in extraordinary session at the Capitol at Boise, in Ada County, Idaho, on next Monday, the 28th day of November, 1938, at 10 o'clock A.M., of said day, for the following purposes and none other, to-wit:

FIRST: For the purpose of considering and enacting legislation providing for the appropriation of money from the State General Fund of the State of Idaho into the Cooperative Emergency Revenue Fund for the financial assistance of aged, needy individuals; relief of the blind; relief of and assistance to the crippled and/or needy and dependent children; relief of those persons who, by reason of physical infirmities, are unable to work, and, also, generally for the relief of needy residents of the State of Idaho.

SECOND: For the purpose of considering and making additional appropriation of funds out of the General Fund of the State of Idaho for the Idaho State Penitentiary for the biennium ending upon December 31, 1938.

THIRD: Providing for the expenses of the session and other matters incidental thereto.

(GREAT SEAL)

IN WITNESS WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Idaho to be affixed by the Secretary of State, this 25th day of November, 1938.

BARZILLA W. CLARK,
*Governor.*

ATTEST:
IRA H. MASTERS,
*Secretary of State.*

---

So far as I have been made aware, no one has ever questioned the power of the Governor to call a special session; nor has anyone claimed any right in either the legislature or the Supreme Court to review the Chief Executive's decision. The legislature, however, is not obliged to pass the legislation which the Governor has deemed necessary, and the Governor in turn is not prohibited from use of his veto—as happened when the legislature was called into special session in July of 1981:

2. To consider and enact legislation reapportioning the membership of the Idaho State Senate and the membership of the Idaho State House of Representatives among the several counties as required by the Constitution of the United States, and by taking into account population statistics reported in the 1980 United States Census; ....

The legislature passed a bill to accomplish that purpose. The Governor vetoed it. The legislature then adjourned, and no such bill was passed at that special session.

Similarly, no one has ever questioned the power of the Governor under art. 4, § 4 to proclaim a state of insurrection, which Governor Frank Steunenberg did on the 4th day of May, 1899. However, as with calling special sessions of the legislature, the Governor's proclamation set forth the facts which prompted him to take such drastic action (which action included obtaining a United States military force from the President) and the truth of those recited facts will not be inquired into or reviewed. *In re Boyle,* 6 Idaho 609, 57 P. 706 (1899). If the legislative enactment here in issue had set forth the facts which the legislature found to exist and to create an actual emergency, we would not have the same controversy. But the legislature set out no facts or reasons whatever in support of its declaration of an emergency.

At page 1142 of this opinion, mention was made of emphasizing the words "expressed" and "express" by an earlier Supreme Court in *Cohn, supra,* in connection with the constitution of Washington—to which state's decision it is appropriate to now turn. There is no discernible difference between *"expressing "* and *"declaring."* In *Cohn,* repeating, the Court made this use of "expressed" where it could have conveyed the same message by using "declared":

"[N]ot only is it important that the will of the law-makers be clearly expressed [declared], but it is also essential that it be expressed [declared] in due form of law, since nothing becomes law simply and solely because men who possess the legislative power will that it shall be, unless they express [declare] their determination to that effect in the mode pointed out by the instrument which invests them with the power, and under all the forms which that instrument has rendered essential." *Cohn, supra,* 5 Idaho at 421–22, 49 P. at 490–91.

A little-known fact, the Constitutional Convention of Idaho and Washington were convened at almost the same time. It is helpful to examine the provisions of each which governed the limitation on the effective date of laws in each state.

| Washington, art. 2, § 31 | Idaho, art. 3, § 22 |
|---|---|
| No law, except appropriation bills, shall take effect until ninety days after the adjournment of the session at which it was enacted, unless in case of any emergency (which emergency must be expressed in the preamble or in the body of the act) the Legislature shall otherwise direct by a vote of two-thirds of all the members elected to each house; said vote to be taken by yeas and nays and entered on the journals. | No act shall take effect until sixty days from the end of the session at which the same shall have been passed, except in case of emergency, which emergency shall be declared in the preamble or in the body of the law. |

What is to be drawn from that comparison is that at the time of the two Constitutional Conventions it mattered not whether the legislature should declare an emergency or express an emergency in order to avail itself of the right to expedite an effective date of legislation. The two words are interchangeable, as has been first noted by the language in *Cohn* and also by resort to a dictionary, and particularly to a dictionary of that time:

> **express—** ... 7. To manifest or reveal by external tokens. 8. To represent in language; to put into words, set forth....
>
> **declare—** ... 2. To manifest, show forth, make known; to unfold, set forth; to describe, state in detail.... *A New English Dictionary,* Oxford: At the Clarendon Press (1897).

Earlier herein was pointed out the further coincidence that Idaho and Washington also adopted their initiative and referendum amendments on the same date, Maj. Op. at p. 1151.

There is no acceptable reason for this Court's failure to apply the precedential decision of *State ex rel. Brislawn v. Meath,* 84 Wash. 302, 147 P. 11 (1915). There are many sound reasons why it should. Notwithstanding that each of the parties to this controversy has provided us with all law from which we should make our decision, the majority studiously avoids doing so. It is said that there are no states with similar constitutional provisions, and hence, it is necessary to beg off with the lame excuse that it is a policy decision—an *ipse dixit ratio decidendi* if ever there was one. The Washington Court was not so timid, and had a decided aversion to judicial decision by fiat. It stated:

> Now there is no more reason for saying that a bill is an emergent measure, when upon its face it is not, and from the very nature of its subject-matter cannot be, *just because the Legislature had said it is so,* than there is for declaring a law to be unconstitutional when it has been passed by the Legislature with the Constitution and its limitations lying open before it....
>
> In passing upon all questions involving a construction of statutes and constitutional declarations and limitations, there is no better test than to consider the old law, the mischief, and the remedy. It was a favorite premise of those venerable sages who have digested the common law and preserved it in authoritative writings. It is still the vital principle in every inquiry into the legality of constitutionality of a statute, for—
>
> "the fairest and most rational method to interpret the will of the legislator is by exploring his intentions at the time when the law was made, by signs the most natural and probable. And these signs are either the words, the context, the subject-matter, the effects and consequence or the spirit and reason of the law." 1 Black Com. 59. *Meath, supra,* 147 P. at 13 (emphasis added).

When in the course of human events, it becomes necessary for a legislature to declare a state of emergency and make intended legislation immediately effective, a decent respect for the opinion of the people requires that it should declare the causes which impel it to such action.

When Thomas Jefferson wrote those words (which I have altered but slightly), he went on to state the case against the King, and stated: "To prove this, let facts be submitted to a candid world," and thereupon enumerated over 25 separate offenses, one of which was that "He has made judges dependent on his will alone,

for the tenure of their offices and the amount and payment of their salaries."[11]

Closing on the predicate and precedent of the greatest Declaration of them all, I rest the case on behalf of the People of Idaho in their resistance to an absolute transgression of the Idaho Constitution.

## ON DENIAL OF PETITION FOR REHEARING

BISTLINE, Justice.

### I.

My vote to grant a rehearing was insufficient, and so the Court does not take advantage of the final opportunity to reconsider its sole basis for holding in favor of the legislature and against the people. It was the people who were by the Court's opinion disenfranchised of their constitutional right of referendum.

A present review of the opinion for the Court which issued in January of this year yields the sole basis of that opinion where at page 14 the Court gives its holding and its reasoning in two sentences:

Plaintiffs' ultimate assertion is that the events which precipitated the enactment of H.B. 2 did not rise to the level of an actual emergency. Whether this is true or not, we hold that the legislature's determination of an emergency in an act is a policy decision exclusively within the ambit of legislative authority, and the judiciary cannot second-guess that decision.

The obvious fallacy is *not* as the Court wrote it, that there might not have been events which did rise to the level of an actual emergency—But, that there were no events whatever.

The legislature simply declared an emergency based on nothing. The *true* holding of the Court's opinion is, then, that this Court, as its membership is presently constituted, will as a matter of judicial policy yield to the legislature's policy of making an unsupported *declaration* of an emergency, and not, as the Court cutely expressed it, "the legislature's *determination* of an emergency." As all respectable constitutional authorities have viewed it heretofore, a factual determination that a state of emergency exists is a prerequisite to a declaration of an emergency. It is that factual *determination* made by the legislature which courts are not inclined to second-guess. Here, however, no such *determination* was made—a conceded fact. A declaration was made? Yes. A determination, no.

### II.

A sorry aspect of this case, in no way attributable to this Court or any member thereof, is that insofar as I have heard, read, or been able to discover, not one newspaper, radio, or television account of this Court's opinion was accurately, or even reasonably close to correct, given to the reading public of what the case was all about. Every article or broadcast which came to my attention portrayed it as the Court's decision as to whether right-to-work legislation was constitutionally valid under Idaho law. That, however, was not the issue, or even considered by the Court. Nor were we asked to consider it.

### III.

My earlier opinion closed with this statement, which purposefully left the reader ignorant of what was being alluded to: "House Bill No. 482, 48th Legislature, 1986 Session, smacks somewhat of King George III." P. 1163 n. 11. Even that provocation caused no stir of media interest. That House Bill was presented to the legislature by Representatives Infanger, Crow, Bayer, Slater, Jones, and Allan, while this Court still had our decision under consideration. The declared purpose of the bill was to repeal the second increment of the judicial pay raise granted by the 1985 legislature.

11. House Bill No. 482, 48th Legislature, 1986